CONNECTICUT AND PASSUMPSIC RIVERS RAIL ROAD COM-
PANY *v.* AZRO BAILEY.

[Decided at the Woodstock Special September Term.]

*Motion to dismiss. Assessments on stock. Parol agreement. Dis-
cretion. Forfeiture of charter. Alteration of charter. Mutu-
ality of contract.*

A motion to dismiss a suit must be for causes apparent on the face of the written
proceedings, and that which requires proof *aliunde* can only be taken advantage
of by plea, and issue joined thereon.

. A promise to pay assessments on stock contained in the book of subscriptions, and
signed by the defendant, will bind him, notwithstanding the charter provides for
a sale of the stock only, in case of a failure to pay assessments thereon.

Parol agreements, made at the time of subscribing for stock, and inconsistent with
the written terms of subscription, are inadmissible, inoperative and void.

Each subscription is an independent undertaking, and in no way affected by the
terms of other subscriptions.

That which is properly submitted to be decided by the discretion of a man, or board
of men, when so decided, cannot be revised by another tribunal.

That which would operate to forfeit a charter granted by the legislature, cannot be
taken advantage of by a stockholder of the corporation, in an action brought
against him for the recovery of assessments on his stock. The State alone can
claim such forfeiture.

Where the commissioners, appointed to receive subscriptions to the stock of a rail-
road, are empowered to reject such subscriptions before the organization of the
company, and do not do so; *held,* that the contract entered into by subscribing
for stock, is sufficiently mutual to make it valid.

This was an action of

ASSUMPSIT, for the recovery of assessments on two shares of
the capital stock of said company, subscribed by the defendant.
Plea, *non-assumpsit* and trial by jury.

On the trial, the plaintiff read in evidence, the act of incorpora-
tion passed in 1835, and also acts of 1843 and 1845, modifying
said act, as set forth in the declaration ; and proved that the com-
missioners named in said acts, duly opened books for subscriptions
to the capital stock of said company, the terms and conditions of
which were as follows :

"CONNECTICUT AND PASSUMPSIC RIVERS RAIL ROAD COM-
PANY."

"Whereas, an act of the legislature of the State of Vermont, of the 10th day of November, 1835, and another of Oct. 31, 1843, were passed, incorporating the Connecticut and Passumpsic Rivers Rail Road Company, and appointing Gardner C. Hall, Calvin Townsley, Henry Smith, Peyton R. Chandler, Allen Wardner, Timothy Shedd, and Erastus Fairbanks, commissioners to open the books and receive subscriptions to the capital stock of said company. Now we the subscribers hereby associate in said enterprise, and do hereby agree with said corporation, to take the number of shares respectively placed against our names, on the following terms and conditions."

"No subscriber shall be held by his subscription to pay assessments amounting in all to more than one hundred dollars on each share, or so much thereof as shall be assessed, the subscribers are held to pay, and said company may enforce their claim thereto, with expenses of collection, by sale of the shares, and by suit, or by either of said means."

"All subscriptions hereto, shall, until said company shall be organized, be subject to the acceptance or rejection of the majority of said commissioners."

"The condition of the following subscriptions is, that all assessments shall be for the construction, and preliminaries for the construction of that portion of the road lying between Derby line and the mouth of White River.

AZRO BAILEY,    .    .    .    .    Two shares.
And others."

On trial, the plaintiffs proved, that before Jan. 15, 1846, at which time said company was organized, there was over $500,000 subscribed to said stock, on said books, that thereupon, said commissioners gave notice for a meeting of the subscribers to the capital stock, to organize said company agreeably to said acts, and that said meeting was held Jan. 15, 1846, and said company organized by the election of officers, and that the commissioners delivered to the officers of the company, a certificate of the organization of said company, and the subscription books of said company.

· The plaintiffs also read in evidence, a certificate of the Secretary of State, showing that said commissioners had certified to him, that notices of the opening of the subscription books, had been duly published, that subscriptions of more than $500,000, to the capital stock of said company, had been made, and that said company had been duly organized, and also showed, that the treasurer had given bonds, agreeably to the requirements of said acts, which had been accepted.

The plaintiffs also showed, that after the organization of said company, the directors had made assessments on said shares, from time to time, amounting in all to $100 on each share, of which due notice had been given to the subscribers, all of which became due before the commencement of this suit, and that the plaintiffs completed and put in operation, about forty miles of their road, from the mouth of White River, north to Wells River, by Dec. 1, 1848, no part of which was denied or controverted by the defendant.

The plaintiffs also gave evidence tending to prove, that the defendant first subscribed for one share of said stock, and afterwards that it was altered to two, by his consent, between the 4th and 8th of Sept. 1845, and before the organization of said company. It was conceded, that the defendant had never paid the assessments on said shares.

The defendant offered no testimony, but from the cross-examination of the plaintiffs' witnesses, it appeared, that the witness who testified that more than $500,000 had been subscribed to the capital stock of said company, did not personally know that all the signatures thereto, were genuine, and that one of the agents employed to procure said subscriptions, agreed with some of the subscribers thereto, that if they, after paying one assessment of five dollars on each share, requested him to take their shares, he would do so, and that in some instances it had been so done, as to persons whose names preceded the defendant's on the subscription book, and in some instances, some of the shares, after being so taken and installments paid thereon, had been surrendered to the officers of the company, and company bonds delivered thereon, and that such agreement was made, and such course was taken with one person, who subscribed for stock, at the same time the defendant did.

No testimony was given tending to prove, that $20,000, or any sum had been expended in the construction, or preliminaries of construction of said road, by Oct. 31, 1846.

The defendant requested the court to charge the jury,

1. That if the jury found that the defendant only consented that his subscription might be changed, on the condition and expectation that he should not have his liabilities increased, and that it was changed on such an understanding, then the change would render the subscription void.

2. That it was necessary for the plaintiffs to show that twenty thousand dollars had been expended in the construction, or preliminaries of construction of said road, by Oct. 31, 1846, or they could not recover in this suit.

3. That it was necessary to prove, that $500,000 had been subscribed to the capital stock, previous to the organization of said company, and that the subscriptions were *bona fide* or they could not recover in this action.

4. That if the jury find that fictitious subscriptions had been obtained previous to the defendant's, and the defendant had thereby been induced to sign for shares, it would be a fraud upon him, and he would be released from all obligation to pay his subscription. ·

5. That by the terms of the subscription, there was no mutuality of obligation, and the defendant not thereby bound.

6. That the subscription, by its terms, does not amount to a promise to pay the assessments, which would support an action of assumpsit.

7. The defendant insisted to the court, that the declaration was founded on the acts of 1835, 1843 and 1845, while the proof showed that the defendant subscribed to the company formed by the first two named acts, that the proof showed that the subscription was not to the company, constituted by the acts declared on; and that the act of 1845, being subsequent to the defendant's subscription, and making a fundamental change in the company, of which the defendant had become a member, and being made without the defendants assent, it discharged him from liability on his subscription.

The court declined to charge the jury as requested, but did charge them, that all private unwritten agreements, made by and with any of the subscribers to the plaintiffs' capital stock, inconsist-

ent with the written terms of their subscription, if made at or before signing, either with those who preceded the signature of the defendant, or with the defendant himself, were inadmissible, inoperative, a fraud on other subscribers, and utterly void ; and if the jury found from the evidence, that the defendant signed said subscription, and that he directed two shares to be annexed to his name, they would find a verdict for the plaintiffs, otherwise for the defendant.

The jury returned a verdict for the plaintiffs, and after verdict and before judgment, the defendant filed a motion in arrest of judgment, for the insufficiency of the declaration, which was overruled by the court.

In this case the name of the clerk, which appeared on the writ and recognizance, was written on slips of paper, and attached to the writ and recognizance by wafers.

And there was a motion to dismiss the action at a former term, which motion was overruled by the court, and which sufficiently appears in the opinion of the court.

To all which the defendant excepts.

*R. McK. Ormsby* for the defendant.

The motion to dismiss was improperly overruled. The statute says, that if a writ shall issue without recognizance, it shall on motion abate, and there was no objection to trying this on motion. The clerk cannot delegate his authority to attorneys to take the recognizances. The principles on which this objection rests, have been recognized by this court, in repeated instances.

The plaintiffs should have shown that $20,000 had been expended by Oct. 31, 1846, as by the act required.

The plaintiffs should have shown that *bona fide* subscriptions to the amount of $500,000, had been subscribed previous to the organization of the company. *Central Turnpike Co.* v. *Valentine,* 10 Pick. 142. *Salem Mill Dam Co.* v. *Ropes,* 6 Pick. 182.

The court erred in refusing to charge as the defendant, by his fourth request, desired. If such fraudulent agreement was made by the plaintiffs' agent, it was not a fraud upon the plaintiffs.

There was no mutuality of obligation in the terms of the subscription. Agreements, to be obligatory, must be equally binding on both parties. It would be absurd to say that this subscription

was binding upon the defendant, while the plaintiffs were at liberty wholly to reject it.

The subscription did not amount to an express promise to pay the assessments. There was a special provision in the charter for selling the shares of delinquents; this remedy should have been resorted to in this case. *Andover and Medford Turnpike Co.* v. *Gould*, 6 Mass. 43.

The most important question in the case arises from the act of 1845, dividing the company in the middle, and instead of requiring two millions of stock to organize, enabling the new company to organize with a subscription of $500,000. The defendant subscribed Sept. 4, 1845. The act, creating the present plaintiffs, was passed Nov. 1845, and no assent of the defendant to the proceeding, has ever been shown; " *non hoc fœdere veni*," more than all, the declaration sets forth the plaintiffs' existence, and founded his action on the acts of 1835, 1843 and 1845, while the proof showed the defendant's subscription to a company formed by the two first named acts. *Middlesex Turnpike Co.* v. *Lock*, 8 Mass. 270. *Middlesex Turnpike Co.* v. *Town*, 1 N. H. 44. Opinion of Chancellor Bennett in *Stevens* v. *Rutland and Burlington R. R. Co.*

*L. Underwood* and *J. W. D. Parker* for the plaintiffs.

The court decided correctly, in overruling the motion to dismiss, nothing appears on the writ, which would warrant its dismissal; the long practice of issuing writs in this manner without objection, has created an authority in its favor.

The court were correct in their charge, that all private and unwritten agreements made with subscribers, inconsistent with the written terms of the subscription, were void. *Blodgett* v. *Merrill*, 20 Vt. 509.

The fact, that it was not proved that $20,000 was expended prior to Oct. 31, 1846, cannot avail the defendant. This was a condition *subsequent*, and need not be alledged, and if alledged need not be proved. If this defendant can defend on this ground, all the other stockholders might do the same, and their refusal, be the very reason why it was not done. *Waterford &c. R. R. Co.* v. *Dalbiac*, 4 Law & Eq. Rep. 455.

The terms of the subscription amount to a promise to pay as-

sessments, and an action of assumpsit will be sustained to enforce their payment. *Hartford and N. Haven R. R. Co.* v. *Kennedy,* 7 Conn. (2d series) 499. *Hartford and N. Haven R. R. Co.* v. *Boorman et al.,* ibid. 530. *Worcester Turnpike Co.* v. *Willard,* 2 Mass. 80. *Taunton &c. Turnpike Co.* v. *Whiting,* 10 Mass. 327. Angell & Ames on Corporations 492, 3, 4, 5, 6, 7 and 8.

The only real question in the case, is whether by the act of 1845, passed subsequent to the defendant's subscription, he was absolved from the payment of his assessments.

It is insisted, that by the terms of the subscription he has substantially consented to it. It is an express condition to the subscription that assessments shall be for *construction* and *preliminaries,* for that portion of the road between the mouth of White River and Derby line, and his assent may as well be inferred from his acts before, as after the act of 1845, and inasmuch as the defendant gave no evidence of his dissent, his assent should be inferred.

Taking the terms of subscription, the charter and act of 1845 together, it is manifest that the legislature passed that act, in accordance with the wishes and at the request of the subscribers, and that this objection is an afterthought.

It cannot be supposed that the subscribers took stock with reference to having a charter extending south of White River, when they expressly provide for the expenditure of their subscriptions on a road north of that point, had the company attempted to construct a road with these subscriptions south of that point, they would have been restricted by injunction, as being in violation of the terms of subscription. *Stevens* v. *Rutland & Burlington R. R. Co.,* by Chancellor Bennett and cases there cited. *Stevens* v. *South Devon R. R.,* 2nd L. and Equity 138. *Hunt* v. *Shrewsbury and Chester R. R. Co.,* 3 ibid. 144. U. S. Law Magazine, Jan. No. 1852, 30, 1 and 2.

We insist that the defendant is estopped from setting up this defense; from the terms of the subscription, and from the fact that he offers no evidence of his dissent, to the change created by the act of 1845, and from the fact that he permitted the company to go on and make the expenditure without objection, it would be manifest injustice now to permit him to set up that defense, and it would operate as a base fraud upon the company. *Graham* v. *Birkenhead R. R. Co.,* 6 Law and Equity Rep. 132.

The opinion of the court was delivered by

ISHAM, J. Several questions are presented in this case, arising first on the motion to dismiss, and secondly, on exceptions allowed on the trial of the case before the jury. The exceptions, taken on the plea in abatement, having been withdrawn, and no objections having been urged to the declaration on the motion in arrest, we are relieved from the investigation of any questions arising thereon.

The motion to dismiss was properly overruled. The writ on its face appears to have been signed by a proper officer, and a recognizance of bail duly taken. The objections are without foundation in fact, so far as it appears from a personal inspection of the record. To find the facts otherwise, it would be necessary that testimony *aliunde* be received, and this would be improper on a motion to dismiss, even if it could be received, under other modes of pleading. The Comp. Stat. 242, sects. 4, 5, requiring writs to be signed by a proper officer, and a recognizance to be taken at the time of signing, and providing that if otherwise issued, the *same on motion* shall abate, contemplates the case where such defects are made apparent upon the face of the writ, and can be ascertained by the court, on an inspection of the record. If reliance is placed on other testimony, to show the writ not duly signed, or recognizance taken, if proper in any case, it must be on a plea in abatement, where an issue can be formed under proper pleadings, so that the case can be tried by the court or jury, as the issue shall be closed.

We are, then, brought to an examination of the questions arising on the second bill of exceptions. The action is brought to recover the amount of several calls, or assessments, made on two shares of the capital stock of this company, subscribed for, by the defendant after the several acts of incorporation were passed, in 1835 and 1843, and before the act of 1845. That the defendant subscribed that instrument with his own hand, and that the subscription was altered from one share to two, by his direction and authority, is found by the jury. It is necessary, however, to sustain this action, that there be an express promise by the defendant to pay the assessments, for the 17th section of the act of incorporation, not only gives to the corporation the right of making and requiring payment, but also the power of enforcing the pay-

ment of those assessments, by creating a forfeiture of all previous payments thereon, and this is the only remedy given by the act. And unless an express promise has been made for such payment, the remedy of the corporation is limited to that prescribed by the charter, and they must proceed by a forfeiture of the stock and payments made thereon. *Medford T. Co.* v. *Gould,* 6 Mass. 40. *N. Bedford T. Co.* v. *Adams,* 8 Mass. 138. *Franklin Glass Co.* v. *White,* 14 Mass. 286. And this doctrine has been recognized in this state in the case of *Essex Bridge Co.* v. *Tuttle,* 2 Vt. 393.

Whether the language used in this subscription is sufficient for that purpose, depends upon the intention of the parties, as ascertained by a proper construction of the instrument. It should contain something more than a promise to become a stockholder or proprietor of a given number of shares. But if it contains in its language, an acknowledgment of a personal liability thereon, and gives the right to enforce that obligation by the usual means of enforcing contracts at law, it would be equivalent to an express promise, and no court would hesitate to say, that the party intended to create such liability for the purpose of giving to the corporation a cumulative remedy, to that given by the charter. In looking at the subscription, we find it clear in its provisions. There is no ambiguity on its face. It first recites, the existence of the charter and the names of the commissioners appointed for opening the books for subscription to its capital stock, " and the subscribers " agree to take the number of shares respectively placed against " their names." If the agreement rested there, the assessments could be enforced only by forfeiture of their stock, but the instrument contains the further provision, "That the subscribers are " *held to pay* to the amount which shall be assessed, and the com- " pany may enforce their claim thereto, with expenses of collec- " tion, by sale of the shares, or *by suit,* or by either of those " means." In this provision, it is obvious they intended to give the corporation their personal obligation for such payment, with the right of enforcing that obligation independent of the right of forfeiture of the stock, and an obligation thus created can be enforced in this form of action.

Several objections are urged against the plaintiffs recovery in this case, not only involving the legal existence of the plaintiffs in their corporate capacity, but also the validity of the subscription

**XXIV.** 31

itself. That the plaintiffs were duly incorporated, and that an organization, in fact, was made under their charter, is stated in the exceptions, and is not disputed. But it is insisted that some of the subscriptions were fictitious, and that the amount required by the act, previous to their organization was not raised. The first section of the act of 1845, provides "That the company may or-"ganize agreeable to the provisions of the act of 1835, so soon as "five hundred thousand dollars shall have been subscribed to the "capital stock." It is evident the legislature contemplated *bona fide* subscriptions, and if they were not so, the organization should not have been effected. We are not called upon, however, to decide upon the admissibility of testimony in proof of those facts, independent of those considerations arising out of the charter, or to what extent such evidence would be available in suits of this character. To guard against fraudulent subscriptions, and to see that this provision of the act was complied with, commissioners were appointed under the 4th section of the act of 1835, whose duty it was to open books and receive subscriptions, and *when the amount required was raised*, to notify a meeting of the stockholders for the election of directors, and of which they are the inspectors; and they are required to certify under their hands, the names of those elected, and by the 5th section of the act of 1845, that organization is to be duly certified to the Secretary of State; and from the certificate of the Secretary, which is made part of the case, it appears that all these requirements of the act have been complied with. As a preliminary question, therefore, before the commissioners could call for an election of directors, and effect that organization, or make their several certificates thereof, they were required to ascertain and find as true, that the full amount was raised by subscription, as required by the act. They were a board appointed by the legislature for that specific purpose, as well as to direct in all those preliminary steps necessary for a legal and proper organization of the company. As the act required their certificate of that organization to be made and filed in the office of the Secretary of State, that certificate must be considered as conclusive evidence of its organization, as well as of the validity and amount of the subscriptions, *so far, at least,* as the question of a legal organization of the company is concerned. It could have been for no other object, but to produce that effect, that the act required that certif-

icate to be made and filed. In the case of *Rex* v. *the Mayor and Aldermen of London*, 3 B. & A. 271. Lord Tenderdon, C. J., remarked, "That if a matter is left to the discretion of any in- "dividual, or body of men, who are to decide according to their "own conscience and judgment, it would be absurd to say that "any other tribunal is to inquire into the grounds and reasons "on which they have decided, and whether or not they have exer- "cised their discretion properly. If such a power is given to any "one, it is sufficient in common sense for him to say that he has "exercised that power to the best of his judgment." The same doctrine was sustained in *Walker* v. *Devereux*, 4 Paige Ch. R. 271. *Rex* v. *the Justices of Norfolk*, 1 N. & M. 67. *The Brooklin Bank*, 1 Edw. Ch. R. 371. On the production of that certificate, therefore, with the other evidence introduced, of an organization in fact, their existence as a corporation, and their organization under their charter, was proved by the best evidence the nature of the case admits, and the certificate, is as conclusive, upon the validity of the subscriptions, and the amount, and on the question of a legal organization, as upon any other preliminary fact, which they were authorised to find and certify.

It is also insisted that the verdict in this case is wrong, inasmuch as no evidence was introduced, showing that the sum of twenty thousand dollars was expended in the construction of the road, as required by the act of incorporation. The second section of the act of 1835, and the third section of the act of 1843, required the commencement of the construction of the road, and the expenditure of that amount thereon, within five years in one case, and three years in the other, or the charter is declared void. The fourth section of the act of 1843, saves from forfeiture, so much of the road as shall be built within the time limited by the act, so that that which remains unfinished, is alone forfeited. The objection, we think, is not well taken in this action for assessments. For it would be exceedingly inconsistent to say that the corporation must expend that sum in the construction of their road, and at the same time deny them the right and power of collecting their subscriptions for that purpose. That could never have been the intention of the legislature. The charter, in its duration, is perpetual, and this provision of the act is a reservation of the right on the part of the State to cause its charter to be vacated, if the cor-

poration neglects or refuses to exercise its corporate franchises within that period. But this cause of forfeiture may be waived by the State, an illustration of which, is found in this charter; a forfeiture accrued under the act of 1835, but was waived by the act of 1843, on this very subject.

It is a matter exclusively between the corporation and the State granting the charter. If they waive the forfeiture, no other person can take advantage of it. If they insist upon the forfeiture as a general rule, the corporation has still its legal existence, until a judgment of ouster is had, under judicial proceedings. " It cannot "be tried or put in issue, collaterally or incidentally, in any other " mode than by direct proceedings for that purpose, against the " corporation." Until, therefore, this charter is vacated, by such proceedings, the corporation has its legal existence, and may enforce payment of its assessments. *People* v. *Manhattan Co.,* 9 Wend. R. 351. *Bank* v. *North,* 4 Johns. Ch. 379. Ang. & Ames on Corpt. 664–5 and authorities there cited. That such matter is no defense in an action against one for assessments, was decided in the case of the *Waterford and Dublin Railway Co.* v. *Dalbiac,* 4 Eng. Law & Eq. R. 455.

An important question in this case, arises upon the evidence tending to prove that the defendant's subscription, was obtained by fraud. The defendant requested the court to charge the jury, " that if they believed that *fictitious subscriptions* had been obtained previous to the defendant's, and the *defendant had been thereby induced* to sign for shares, it would be a fraud upon him, and that he would be released therefrom." There was testimony justifying that request, and the neglect or refusal of the court so to charge the jury, gives to the party excepting, the benefit of that fact, so that the question arises, whether that constitutes such a fraud as will avoid this subscription. The court charged the jury, " that all private, unwritten agreements, made by and with, any of the subscribers, inconsistent with the written terms of the subscription, if made at or before signing, either with those who preceded the signature of the defendant, or with the defendant himself, were inadmissible, inoperative, a fraud on the other subscribers, on the plaintiffs, and utterly void, and that if they believed the defendant signed the subscription, and directed two shares to be annexed to his name, they should find a verdict for the plaintiffs."

It is evident, that if an action had been brought against those prior subscribers, on their respective subscriptions, or those who became such, at the time the defendant subscribed, no agreements or arrangement with them, inconsistent with the terms of their subscription, could be received in evidence, in avoidance of their contract. If they signed that subscription, they are bound by its expressed terms and conditions, and if done under an agreement that they should not be liable, and to induce others to sign, they became parties to the fraud, and would not be permitted to avail themselves of their own wrongful acts to avoid their contract. They would be estopped to deny its binding character and obligation, and be required to discharge to the corporation and all interested therein, that obligation which they have assumed, according to its terms. In depriving them of such matters in defense, the law makes the subscriptions *bona fide*, and requires them to fulfil and answer those expectations and inducements which they have held out for the purpose of procuring other subscribers. This doctrine is enforced by considerations of public policy, as well as of good faith, and is now considered as settled law, in this State. This was the doctrine established in the case of *Blodgett* v. *Morrell*, 20 Vt. 509, where it was ruled that such testimony was not admissible, when offered *by those with whom* such arrangements were made, and who were parties to such fraudulent attempt. And when this testimony is offered *by those who subsequently signed* the subscription, who were not parties to the fraud, and who thereby were induced to become subscribers, the testimony becomes equally inadmissible. For as the prior subscribers are held bound to their subscription, and to carry out to the letter, every inducement they have held forth, no fraud has been practiced upon them to make their subscriptions. And they have no reason to complain, for they see fulfilled and answered, every inducement that was held out to operate upon them. The case is made to stand, in that respect, in the same situation in which they were induced to believe it stood, when they subscribed for the stock. In the case of *Blodgett* v. *Morrill* it was also very properly said, " that if such prior agreements were binding and had been acted upon and the subscriptions discharged, yet it would not be such a fraud as would relieve the defendant, as each subscription is an independent contract ; and one, having no legal right to depend upon an-

other." While the common law gives to all, relief against fraud, it at the same time requires of the other party the exercise of all reasonable care and prudence in observing the ordinary and accessible means of information, and he has no reason to complain of imposition or surprise, where he has been wanting in that care and attention to all those particulars which are within his reach and observation, and by which that imposition might have been avoided. *Omrod* v. *Huth*, 14 Mees. & Wels. R. 651 and note to American cases. 2 Kent's Com. 622 last edition. It is to be observed, that the case does not state, nor was there an attempt to prove in the case, any false representations or statements made to the defendant at the time his subscription was made. He was not, therefore, induced to make the same, by any considerations of that character. And the private agreement with former subscribers, even if acted upon, would not be a fraud that would release the defendant, as there is wanting, not only the exercise of ordinary observation and care, in obtaining that information and knowledge, but on the more definite ground that the defendant's subscription was an independent contract, in no way connected with the others, and from which no matter could arise creating an inducement operating upon the defendant, which in law will enable him to avoid his subscription. He has no more reason *to complain*, than any purchaser of property can make complaint because similar commodities were sold to others, under different arrangements from that made with him. On the ground of fraud, therefore, the court properly ruled the testimony inadmissible ; and independent of fraud, the testimony was inadmissible as contradicting and altering the terms of a written agreement.

There is no want of mutuality to render this contract binding. The provision in the contract, that until the organization of the company, the subscription was subject to the acceptance or rejection of the commissioners, does not affect the defendant's obligation. It does not appear that it was ever rejected by the commissioners, and when the company became organized, and no act was done disaffirming the subscription, it became binding on them, and entitled the defendant to the stock, and the corporation to the assessments. 2 Kent's Com. 465 note. 2 Hamp. R. 19.

It is further insisted, that the defendant is discharged from his subscription, as it was made before the passage of the act of 1845,

and that by the provisions of that act a fundamental change has been made in the charter, to which he has never assented. The original charter, granted in 1835, was passed with a capital of two millions, with liberty to increase that amount to three millions, for the purpose of constructing a Railroad along the valleys of the Connecticut and Passumpsic Rivers, from the southern to the northern boundaries of the State. The act of 1845, effected a change in the charter of the corporation, as it existed under the acts of 1835 and 1843, by altering the southern terminus of the road, and limiting it at or near the mouth of White River, instead of the southern boundary of the State, and authorizing an organization of the company " as soon as five hundred thousand dollars shall have been subscribed to the capital stock."

As a great portion of the road to be constructed under their original charter was surrendered, and the necessity of that amount of capital obviated, the first alteration very properly gave rise to the last. The subscription was signed or changed from one to two shares, but a few weeks before the session of the legislature, at which the alteration was made. And it is evident, by looking at the subscription, and the conditions therein expressed, that the change was sought for, as beneficial to the corporation, and that the subscription was made with a view to that alteration in the charter. It was not to be binding unless the assessments were appropriated for the construction of that portion of the road lying between Derby line and the mouth of White River. The assent, and even requirement of these subscribers to these alterations, is to be inferred therefrom, and it is not for them to object to such alterations as were necessary to effect their common object, and which permit the application of the money to the purpose, and for the object for which it was specifically subscribed.

Under this view of the act of 1845, we are not called upon to express any opinion upon the question whether any or what subsequent change in a charter will have the effect to discharge subscribers to the stock, from the payment of their assessments. The cases in Massachusetts and New Hampshire are in conflict with the cases of the *London and Brighton R. Co.* v. *Wilson* and the same v. *Fanclough*, 37 Com. Law R. 317, and the question is of too much importance to be disposed of in a case where its investigation and decision is not necessarily required.

The judgment of the county court must be affirmed.