THE DAYTON & CINCINNATI RAILROAD COMPANY *v.* GEORGE HATCH, WILLIAM F. RŒLOFSON AND EMILY RŒLOFSON, HIS WIFE.

1. The acceptance of an amendment to its charter, is a power incident to a corporation, and its exercise belongs to the board of directors, if there be no other active governing body in whom it is vested.

2. The acceptance of such an amendment may be either by express act, or may be implied from other acts or circumstances. The subsequent use of the privilege, or exercise of the power conferred by the amendment, may well be deemed an assent to the grant; and that whether contained in a special law, applicable to the particular corporation alone, or in a general law, applicable to it and others; unless some special mode of acceptance is required by the terms of the grant.

3. In the absence of express legislative enactment, an organized corporation has the same *power of disposition* over its unsubscribed capital stock, as any ordinary owner; and it may be exchanged for land, to be sold again when it has general power to purchase real estate. If it be an abuse of its corporate power, it furnishes no ground on which the vendor of the land can object.

4. When it is a condition precedent in a contract, for the subscription to the capital stock of a corporation, that other stock, to a given amount, shall have been taken, that condition is waived by the conduct of the parties, in paying the first instalment on the subscription, voting the whole stock at an election for officers, and acting as officer in the corporation.

5. On a breach of an agreement to give land for stock, if a specific performance can not be decreed, compensation in damages will be awarded— not measured, necessarily, by the nominal value of the stock, but by reference to the land which ought to have been conveyed, and such damages as may have resulted from delay in the performance.

SPECIAL TERM.—The plaintiff, a body corporate, organized under the laws of the State of Ohio, brings its action, on January 20, A. D., 1855, to recover, in money, the amount of seven unpaid ten per cent. instalments, assessed upon certain stocks, subscribed in the name of George Hatch, by two certain contracts of subscription, executed by Hatch—the one on the 10th and the other on the 12th of April, 1852, in words and figures following, to wit:

" We do hereby subscribe to the capital stock of the Dayton & Cincinnati Railroad Company, the number of shares

annexed to our names respectively; and we do agree to pay one instalment of five dollars on each and every share so subscribed by us, so soon as the subscription shall become binding; and the residue thereof in such instalments, at such times and places, to the treasurer of said company, as may be required by the president and directors thereof.

*Provided*, That these subscriptions shall not be binding unless the aggregate amount subscribed, shall reach six hundred thousand dollars.

*March* 27, 1852,

| NAMES. | NUMBER OF SHARES. |
|---|---|
| George Hatch, | |
| Payable in ground, in the 12th fractional section, in Cincinnati; and provided the work is commenced by Oct., 1852." | Four hundred.   $20,000 |

2. " We do hereby subscribe to the capital stock of the Dayton & Cincinnati Railroad Company, the number of shares annexed to our names respectively: The number of shares so subscribed by us, to be paid for in the manner defined in a resolution of the said company, passed at a session of the directory of said company, held on the 25th of March, 1852, and which reads in the following words, to wit:

' *Resolved*, That subscriptions to the capital stock may be made in real estate, along the line of the proposed route, *provided* that the value of the same shall be ascertained by the appraisment of three disinterested persons, one to be chosen by the subscriber, one by the company, and a third to be chosen by these two, who shall make their award in writing, and who shall estimate the property at the cash value.'

| NAMES. | NUMBER OF SHARES. |
|---|---|
| George Hatch. | |
| Payable in ground in the 12th fractional section, in Cincinnati; and provided the work is commenced by Oct. 1, 1852. | Six hundred." |

Plaintiff alleges that more than six hundred thousand dollars of stock were subscribed by the first day of September, A. D. 1852; that the defendant, George Hatch, paid the first instalment on March 19, A. D. 1853, by a conveyance of land, in said twelfth section, of the value of five thousand dollars, Emily Avery, since intermarried with William F. Rœlofson, joining in the deed of conveyance; that a second instalment of ten per cent. became due and was called for on July 26, A. D. 1854, and on November 23d of that year, the defendant, Hatch, made a second conveyance of land, of the appraised value of seven thousand five hundred dollars, and has since utterly refused to convey more land to the company, in payment of the said subscriptions, or of the amount due on either of them; that on December 1st, of that year, the plaintiff tendered to the defendant certificates for one thousand shares of the stock of said company, and demanded a conveyance of land, in said fractional section, of the appraised value of thirty-seven thousand five hundred dollars, but the defendant refused to receive the certificates of stock, and refused to make a conveyance; that on the same day the company made a similar tender of six hundred shares of stock, with a demand for a conveyance of land of the appraised value of twenty-two thousand five hundred dollars, which was also refused.

Plaintiff further alleges, that it is informed that Rœlofson and wife claim some interest in these contracts, but of what nature the plaintiff is not advised, and prays that they may be notified by summons in this suit, and may set up what interest they have, if any, in the subject-matter thereof, and that, as to them, such relief may be granted as shall then appear proper.

The defendant, Hatch, files his answer, on February 17, A. D. 1855, alleging that Emily Avery, since intermarried with W. F. Rœlofson, was jointly interested with him in said ground, in fractional section twelve—the said Emily owning five-sixths and he one-sixth—and that prior to making the subscriptions, he was authorized by said Emily

to subscribe for said shares of stock, and she agreed with him to pay for the same in the manner specified in two certain agreements, in writing, made by and between them— the one under date of April 13, A. D. 1852, and the other under date of July 26, A. D. 1852—whereby it was set forth that Hatch had made the subscriptions, and that the same were made for their mutual benefit, and that when the subscriptions were paid, Hatch would transfer to her five-sixths of the stock, and she agreeing to join with him in a conveyance, in fee simple, to said Railroad Company, of so much of the premises owned by them in fractional section twelve, as should be sufficient to pay the subscriptions.

The answer of Hatch also alleges that said Emily and her husband have refused to comply with their obligations, and have not paid up their portion of the subscriptions, and it is prayed that this answer may be taken as a cross-petition against them, and that they be required to perform the said agreements, and save defendant harmless from all further liability on said subscriptions, and be required to convey sufficient land to plaintiff to exonerate this defendant, etc.

Mr. and Mrs. Rœlofson filed their answer to the petition on May 11, A. D. 1855, and on the 31st of the same month, file an answer to the petition of the plaintiff and to the answer and cross-petition of the defendant Hatch, in which they admit the facts stated in Hatch's answer, but allege that the Railroad Company had no power to receive such subscriptions in land; that the subscriptions for the stock of the Company, as represented by its officers, purport to amount to seven hundred and fifteen thousand dollars; and charge that subscriptions to the amount of more than ninety thousand dollars were upon condition that the work on the railroad should be performed in a certain manner, which conditions have not been complied with, and the subscriptions to that extent, are void; that subscriptions to the amount of at least one hundred and eighty thousand dollars were taken, payable in land; that land of that nominal

value, has been conveyed to the Company in payment of such subscriptions, but that, in fact, the land was not worth more than one hundred and twenty thousand dollars; and that said excessive allowance for said land is in fraud of the subscribers, who subscribed under said six hundred thousand dollars condition, and the same should be deducted; that the subscriptions for stock do not amount, and never have amounted, in good faith, to the aggregate sum of six hundred thousand dollars, according to the true intent and meaning of the condition under which the subscriptions of said Hatch were made; and the said Emily avers that she is not now, and never has been, a stockholder in the said corporation, or ever made herself responsible to the plaintiff upon any subscription whatever—and asks that the contracts made by said Hatch with said Company, on her behalf, and the contracts of ratification of herself and said Hatch, may be held to be void and decreed to be canceled; that the conveyance of the land in payment of the first instalment be set aside, and the plaintiff be decreed to reconvey the same, and that the plaintiff be enjoined from setting up any title, or prosecuting any claim, against lands of the defendants in said fractional section twelve.

The plaintiff, under date of June 9, A. D. 1855, files separate replies to the answers of Hatch and of Rœlofson and wife, alleging that at the period of the making of the subscriptions, the plaintiff was not informed, and did not know, that the same were made in pursuance of any authority given to the said Hatch by the said Emily Avery, or of any contract between the said Hatch and Avery, or that the said Avery had, or claimed to have, any interest therein; denies that any conditional subscriptions were taken; denies the allegation as to the amount and value of land taken on stock subscriptions, and alleges that the amount of stock subscribed, before the first instalment was called, was more than twelve thousand shares, of the value of six hundred thousand dollars.

Dayton & Cincinnati R. R. Co. *v.* George Hatch, et al.

*Geo. H. Pendleton* and *Geo. E. Pugh*, for plaintiff.

*Corwine, Hayes & Rogers* and *M. H. Tilden*, for Hatch.

*James & Jackson* and *Thos. Ewing*, for Rœlofson and wife.

GHOLSON, J. There are two principal questions which arise in this case, and which have been very ably and elaborately argued. Both these questions involve the validity of subscriptions of stock, made by George Hatch, to the Dayton and Cincinnati Railroad Company. One of them depends on the power of that Company to receive a subscription of stock in real estate, or to exchange or dispose of a portion of its stock for real estate; and the other, on the happening, or the performance of a condition made precedent to the taking effect of one of the subscriptions.

With a view of deciding upon the power of the Company to take a subscription in real estate, or dispose of its stock and receive real estate in payment or exchange, it may be useful to inquire whether the solution of the question depends on the general corporate powers of the Company under its original charter, or the acceptance of, or acting under, the express power provided in the general railroad law, and to examine, briefly, into the nature and character of corporations, and of what are called joint stock companies.

There is certainly a very clear distinction between a corporation and a partnership. One is an artificial being, having such functions and powers as the law gives it; the other is a company of individuals, brought together by their own agreement, and doing, as individuals, those things which individuals under the law may do, acting each one for all, so far as they have agreed, and to no greater extent. Their sources of power are essentially different. It is the law, and not the organization or agreement of individuals, which gives life and being to a corporation. The existence of a partnership begins, continues, and ends with and by the agreement of the individuals of whom it is composed. 7 Cushing, 188–192, *Fay* v. *Noble.*

The term "joint stock company," appears to have originated in England, in comparatively recent times. Joint stock companies may be said to be partnerships, or individuals associated for some specified purpose, under a designated name or description, to which, by some general or special statute, when they have been formed or composed in a specified manner, some of the powers or proper attributes of a corporation have been given. They are corporations for certain purposes, or *quasi* corporations; 29 Eng. Law and Eq. Rep. 516. So far, then, as in their organization they partake of the character of corporations, they should be governed by the principles controlling corporations, and, so far as they are partnerships, the principles applicable to the latter should control.

The distinction which has been adverted to, was contemplated in a recent case, 19 Eng. Law and Eq. Rep. 11, *Ffooks* v. *The London and S. W. Railway Co.*, in which it is said:

"No doubt it is true, as a general principle, that the majority can not bind the minority in a joint stock company, as to an act not within the common contract, if it be an act to extend the liability of the whole body in a way not contemplated by the contract—as in borrowing money to extend the capital, where the amount of capital was limited by the contract. This was so held in 6 Exch. 796, *Burmester* v. *Norris;* s. c. 8 Eng. Rep. 487. But although this, generally speaking, is the law as to joint stock companies unincorporated, and unconnected with public duties or interests, it has not been applied to corporate companies for a public undertaking, involving public interests and public duties, under the sanction of parliament. In such cases the court of chancery has permitted the use of the corporate seal, and the moneys of the company, to obtain the sanction of parliament to purposes materially altering the interests of the shareholders according to the contract, *inter se.*"

It is not necessary for me to determine, in this case, whether corporations, such as the plaintiff, are, in any res-

pect analagous, as to the exercise of corporate powers, to those joint stock companies in England, which are usually constituted by a deed of settlement, executed by the shareholders, and regulating the purposes and objects of the company, and the powers of those intrusted with its management, and subjecting them, frequently, to the control of a general meeting of the shareholders. It might well be doubted whether a general meeting of the stockholders of the plaintiff could be legally held for any other purpose than the election of a board of directors. Such a meeting as to any other purpose or object, could only be, in its character, advisory to the board of directors. It would have no power to take under its charge, or put under the charge of others, the affairs of the company. The president and directors of such a corporation as the plaintiff, have been said to be the agents of the stockholders; but this expression must be understood in view of, and must be limited to, the subject under consideration. In anything like a general, or universal sense, it will be readily seen that it can not be true. Indeed, so far as third persons, and, especially the government, or creating power of the corporation are concerned, the president and directors, and the stockholders, may rather be considered as the members or limbs, each acting within its appropriate sphere, of that artificial being, or entity, to which the name and powers of the corporation have been assigned by the law of its creation. When, therefore, a question arises, by whom the conferred powers are to be exercised, it will be determined, rather by the law of the creation of the company, showing, in each case, on whom the governing, or controlling, power has been conferred, than by any consideration of the rights and interests of those concerned in the corporation, as among themselves.

Having these general principles in view, I proceed to consider whether there was power in the plaintiff to take a subscription in real estate, or exchange its stock for land.

As a section of the general railroad law of 1848 confers on railroad companies a power to receive subscriptions in

real estate, and gives to companies then existing a right to accept that section as an amendment to their charters, the inquiry will be first made whether the exercise of the power, in this case, can be sustained under that express provision of the law; and this will depend on the questions:

1. Whether the directors had the power to accept the amendment?

2. Whether the acts done amount to an acceptance?

Upon examining the charter of the plaintiff, there would be some difficulty in determining by what power, and in what mode, the amendment could be accepted, if not by the directors of the company. That both the special charter of the plaintiff and the general railroad law contemplated that all corporate acts, including an assent to such an amendment as the one authorized, should be done by the board of directors, appears to me to be clear. The legislature has, in some cases, in respect to some matters, authorized action on the part of stockholders, and directed their assent to be obtained. Such provisions will be found in the general railroad law, and they are on points vitally affecting the interests of the stockholders. These provisions appear to show, strongly, that without them, such changes might be made, under the authority of the legislature, by the directors alone.

It is admitted, in all the authorities, that the acceptance of an amendment to its charter is a power incident to a corporation; and if, from the organization of the company, there be no other active or governing body, but its board of directors, then, I conceive, with that board must rest the right to exercise the powers of the corporation, and, among them, the power to accept an amendment of its charter.

It is true a distinction has been taken, in some modern cases, between amendments that are *auxiliary* to the objects of the corporation, and such as make a *fundamental* change in its original purpose. Even if this distinction were well founded, I see nothing in the amendment under consideration that might not, with the utmost propriety, be deemed auxiliary to

the objects of the company; and it has been said that, if the object of the change be auxiliary to.the original object of the charter, the mere fact that it would make the charter less beneficial to the stockholders can not be urged as an objection. 1 Am. Law Reg. 154. But I do not assent to the idea that, as between the government that creates the corporation, and the governing body of the corporation, the power of amending a charter, and the right to accept an amendment, can depend on its character; that is a matter which must certainly rest in the wisdom and justice of the *legislature*, and in the discretion of the bodies competent to act. At least it seems clear, that the only limit to the power of the government to change the character of the artificial being it has created, with the assent of that being, and in the only mode it can give its assent, must be found in some contract protected by the constitution of the United States. And accordingly the distinction before alluded to has been placed on that ground, and it has been held that no fundamental change of a charter can be made, unless assented to by every stockholder. This might be right if the stockholders could be considered as standing toward each other in the position of partners, contracting with each other as to the terms of their connection; and it will be found, on inquiry, that most, if not all of the cases, by which any such distinction has been sustained, are, in truth, cases of partnership, and the principles applicable in cases of partnership, have controlled their decision.

But there is an insuperable difficulty in supporting any distinction (founded upon an idea of a contract of partnership, between the stockholders of such a railroad corporation as the plaintiff, and that this contract is protected by the constitution of the United States), between what is termed a fundamental change, and one merely auxiliary. If there be a contract between the stockholders, and the constitution of the United States applies at all, then it does not merely protect fundamental alterations in the contract, but any alteration by which its obligation is impaired; "in short," as said by Jus-

tice Washington, in the Dartmouth College case, 4 Wh. 662, " does not every alteration of a contract, however unimportant, even though it is manifestly for the interest of the party objecting to it, impair its obligation ? If the assent of all the parties to be bound by a contract be of its essence, how is it possible that a new contract, substituted for, or engrafted on another, without such assent, should not violate the old charter ?" It would therefore be difficult to escape the result, that if any amendment of a charter was a change in contract to which the assent of the individual stockholders must be obtained, all amendments must be so considered. But surely no stockholder of one of our ordinary railroad corporations has entered into any such contract. The true doctrine is found, as I think, in a recent case in Massachusetts, in which it is said :

" The individual members of a corporation, whether they should all join, or each act severally, have no right or power to intermeddle with the property or concerns of the bank, or call any officer, agent, or servant to account, or discharge them from any liability. Should all the stockholders join in a power of attorney to any one, he could not take possession of any real or personal estate, any security or chose in action ; could not collect a debt, or discharge a claim, or release damages arising from any default, simply because they are not the legal owners of the property ; and damage done to such property, is not an injury to them. Their rights, and their powers, are limited, and well defined. They are members of an organized body, and exercise such powers as the organization of the institution gives them." 12 Metc. 371–385, *Smith* v. *Hurd*.

· In reality, therefore, the question resolves itself into this : Is the acceptance of an amendment a corporate act—an act of the artificial being ; or, is it an individual act of the persons beneficially interested in the corporation ? If it be the former, as I am satisfied it is, then it must be done, and can only be done, in the mode prescribed by the law of the creation of the company, whether that authorize the act to be done by a gen-

eral meeting of those interested, or by a board of directors. It becomes, in each case, a question of construction. In the present case, I conclude that the board of directors may act, because I find them intrusted generally with the powers of the corporation, and only an elective power conferred on the stockholders.

The next question is, whether the authorized amendment has been accepted by the company? It can not, I think, be doubted, that the acceptance of an amendment may be either by some express act, or may be implied from other acts or circumstances. The acts and circumstances from which the acceptance of an amendment may be implied, would depend very much upon the character of the amendment itself. As a general rule, when the amendment consisted in a simple grant of a beneficial privilege, or power, upon the corporation, the subsequent use of the privilege, or exercise of the power, might well be deemed an assent to the grant by which it was conferred. If the amendment under consideration, had been contained in a special law, applicable to the plaintiff, there could be no doubt as to the application of the rule I have stated. I can see no good reason to draw a distinction, because the amendment is connected with others, contained in a general law, and applicable to other corporations.

This view is, I think, strengthened by the consideration, that in the general corporation act, since enacted, the legislature has thought proper to require direct evidence of the acceptance of an amendment.

Being satisfied as to the correctness of the views expressed as to the direct power under an amendment, it is not necessary that I should enter into any full consideration of the question how far the general powers of the company, after its organization, authorized an exchange of a part of its capital stock for real estate; but there appears to me no good reason to doubt that it did possess such power. The subscription of stock prior to the organization of the company, and the disposition of that part of the capital stock not taken when the

company organized, do not stand on the same ground, and in the absence of express enactment, it would by no means follow, that a rule applicable to the one should also govern as to the other. Though the commissioners to open books for the organization of the company might have no power to receive, or agree to receive, anything but money in payment of a subscription, it would not follow that the proper *authority* of the organized company might not do so. It might well be claimed that the preliminary directions for the organization of the corporation *ceased* to operate after its organization, and so, I think, it has been substantially decided. 15 Ill. 399, *Smith* v. *Bangs.*

What, then, are the rights of an organized company over its unsubscribed stock? It appears to me that, in the absence of any express legislative provision, it has, simply and plainly, so far as respects the power of disposition, the rights of an ordinary owner—the same rights which it would have over any portion of the subscribed stock, which might be transferred to it in payment of a debt, or otherwise. From the *nature* of the interest in it, such stock can not be voted; but I think no good reason can be offered why such stock may not be used in the payment of debts, or exchanged for labor, or property, which the purposes of the company might require, or which it had the power to employ or acquire. I am not aware of any case in which this power of an organized company over its unsubscribed stock has come under consideration. That it had a power to dispose of such stock appears to have been the opinion of the court in 3 Md. Ch. Dec. 418, 453, *Williams* v. *The Savage Man. Co.*; and I see, in a very recent case, where the commissioners to open the books of subscription, instead of taking a first instalment of five dollars on a share in money, had received it in a promissory note, and that note having been transferred to the company, on the completion of its organization, and sued on, that the court, in answer to an objection to the validity of the contract, said, that *there being no requisition* that the payment should be made in specie, as was sometimes the case in

bank charters, either money, or money's worth, might be received; 1 Am. R. Cases, 229, *Vermont Central Railroad Co.* v. *Clayes.* It would seem that, in such a case, though the company, on its organization, might have refused to receive the note instead of the money, yet it had the right to confirm and sanction the transaction. Having the exclusive right to the money, it might agree to receive the money's worth.

It is a familiar principle, that a grant of all the rents and profits of land is a grant of the land itself. So the power, which has the exclusive and absolute control and disposition of any profits, or proceeds, arising from the subscription of stock, may well be allowed to control and dispose of the stock.

I do not know that the general power, on the part of the company, to acquire real estate by purchase has ever been questioned. It has been granted in very general terms. For what purpose the real estate is acquired, whether to be held or disposed of again, can not be a proper inquiry, in a case between the company and any one contracting to sell or convey. Such a question could not be raised by the company to get rid of a bad bargain; neither can it be raised by the other contracting party. If the power exists, the bargain must stand, and be carried out. It is no concern of his what may become of the land afterward. If there be a right in the State, or any one else, it is not for him to set it up. It is enough for him that he does no wrongful or illegal act in conveying the land; 24 Vt. 465.

A question remains as to one of the subscriptions, whether the condition precedent as to the obtaining six hundred thousand dollars of stock has been complied with. I do not think it necessary to enter into an examination of the facts offered to show that the stock subscribed amounted to the sum named, or of the particular objections to some of the subscriptions. I am entirely satisfied that the acts and conduct of the parties must be considered as a waiver of the condition, and that they do fully estop and conclude them from insisting on any such objection.

7

The paying of the first instalment of the stock, the voting the whole stock at an election of officers, not to speak of acting as the chief officer of the company, under that election, must be deemed sufficient to conclude a party from denying that he ever was a stockholder.

Such acts must be considered as having effect and influence on the operations of the company, and the conduct and rights of other stockholders, and bring the case within the very principle governing an equitable or parol estoppel; 22 Conn. 435, 450, *Danbury & Nor. R. R. Co.* v. *Wilson;* 24 Vt. 477; 1 Ohio St. 1.

Being satisfied that the contract for subscription is valid and obligatory, I have next to inquire as to the measure and mode of relief proper to be administered among the parties to the present action.

I have examined with care the written contracts offered in evidence, and there does not appear to be any thing in them which prevents a construction in accordance with what was manifestly the intent of the parties—the conveying real estate and taking its equivalent in railroad stock. The contracts show the nominal or par value of the railroad stock, and that the value of the land, under an appraisement, in cash, is to be equal to that nominal or par value of the stock. But it does not follow that, on a breach of the agreement to give land for stock, there was a right to exact a sum of money equal to the nominal value of the stock. On the contrary, the land to be given in exchange is what would have been received if the contract had been kept, and that land, or a proper equivalent for it in money, is what the other party is entitled to if the contract is broken.

If the contract can now be performed in the mode intended, it should be done; if not, there may be a proper compensation in damages. But in estimating those damages, reference should be had to the land which ought to have been conveyed in exchange for the shares of stock, and not to the nominal value of the stock. Substantially, there was no agreement to pay money, but to convey land. The breach

of the agreement can not be turned into a liquidated money demand, estimated by the amount of the assessments on the stock. Such was not the intent of the parties, and such a measure of relief might operate most unjustly.

I am of opinion that any land held by the parties defendant, within the location described in the contract, to which they can now convey a sufficient title, may be subjected, under a judgment order, to be applied, specifically, to its performance. If it can be so performed, the plaintiff will also be entitled to an inquiry as to the damages from the delay in the performance. If there be no such land, then there must be an inquiry, either by a master, or before a jury, as to the proper compensation, in damages, for the loss of the land, upon the principles which have been stated.

Decree for plaintiff.