## TRUMAN vs. McCOLLUM and another.

*Railroad mortgage—Agency for both parties—Delivery of note and mortgage to agent on parol conditions—Waiver of the conditions—Trial by jury in foreclosure—Ch. 169, Laws of 1864.*

1. Whether one acting as an agent of a railroad company in procuring stock subscriptions, and receiving notes and mortgages running to the company in payment thereof, can take such securities as an *escrow*, or whether delivery to him will be in law a delivery to the grantee, *quære.*

2. In an action on such a note and mortgage by an assignee thereof from the company, the defense was, that they were delivered to the agent on a special trust, to be delivered to the company on its fulfilling certain parol conditions, and that the company got possession of them without performing the conditions, and without the assent of the agent or of the maker. It appeared that defendant knew, early in 1856, that plaintiff held and claimed to own said securities; that he did not until 1858 make any objection to plaintiff's possession, or demand or take any steps to regain the possession, and did not, until about the commencement of this action, inform the plaintiff of the facts relied on as a defense; and that in 1858 he received of the railroad company a certificate of the number of shares of its stock so subscribed for by him, without making objection to the delivery of said instruments to the company or its sale of them to the plaintiff. *Held,* that the defendant must be regarded as having assented to the delivery of the securities to the company, and waived the original conditions upon which such delivery was to be made.

3. Where the complaint alleged an unconditional assignment to the plaintiff of the note and mortgage sued on, and the evidence showed that they were assigned by a clause in the mortgagee's bond, as security for the payment thereof, with authority to the holder of the bond to maintain an action upon them on default in payment of the bond, which had occurred: *Held,* that it was too late to object for the first time in this court to the variance between complaint and proof.

4. Where a bond is payable at a particular place, it is not necessary to aver and prove a demand of payment at that place in order to show a default.

5. Chap. 169, Laws of 1864, which requires every issue of fact joined in an action to foreclose a mortgage executed to a corporation, to be submitted to a jury on demand of either party, is invalid.

APPEAL from the Circuit Court for *Dodge* County.

Action on a note and mortgage executed by *James F. Mc-Collum* to the La Crosse & Milwaukee Railroad Company, in June, 1855, to be paid for in its capital stock. The note was for $6000, payable to the said railroad company or its order, January 1st, 1865, with interest at eight per cent., at the city of Milwaukee. The defendants having requested that certain of the issues made by the pleadings might. be tried by a jury, the judge assented, but declared that he should not feel bound by the verdict. The following issues were submitted to the jury, by consent of the parties : 1. Whether the note was ever *endorsed* by said railroad company to the plaintiff or any other person. 2. Whether the note and mortgage were placed in the hands of Charles Burchard upon the agreement and condition that they should be delivered to the railroad company only in case it should deliver to the defendants, or to Burchard for them, in exchange therefor, its certificates for sixty shares of its full paid capital stock, of the same character as defendants would have been entitled to in case they had subscribed and paid cash for the capital stock, and should complete its road as far west as Beaver Dam by October 1st, 1855 ; and should raise, west of Rock river in Dodge county, *bona fide* notes and mortgages similar to those of the defendants, to the amount of $100,000, which should be received by said company in exchange for its certificates of stock, such as above described. And if the note and mortgage were placed in Kneeland's hands on any or all of such conditions, whether the company complied with the conditions, and so became entitled to a delivery to it by Burchard of said note and mortgage. 3. If the company did not become entitled to such delivery, whether it

became possessed of the note and mortgage by any fraudulent or unlawful means, and what means.    4. Whether the company, by any of the false and fraudulent representations set forth in the answer, procured the execution of said note and mortgage, or the delivery thereof to its officers or agents.

It appeared from the evidence that the note and mortgage were attached to and transferred with a bond of the railroad company for $6,000, payable 1st July, 1865, at the Broadway Bank in the city of New York, to James Ludington or bearer, to which were attached coupons for semi-annual interest. The bond contained a clause assigning and transferring to the holder thereof, as collateral security, the note and mortgage in suit, which are declared to be transferable in connection with the bond, and not otherwise; and by a further clause the company authorizes the holder of the bond, upon any default of payment thereon, to proceed and foreclose the mortgage, or take such other legal remedy on the note and mortgage, or on the bond, or on both, as he should deem proper.—Stoddard Judd, as a witness for the defendants, testified that he was a director of the La Crosse & Milwaukee R. R. Co., from the last of March, 1853, to February, 1856, and president thereof from October, 1853, to February, 1856; that the company had commenced taking farm mortgages before he was director, say in February, 1853 ; that the following resolution was adopted by the board March 31st, 1853 :  " *Resolved,* That the president be directed to prepare bonds in blank, in the name of this company, for the purpose of being connected with land mortgages, as collateral for loans to be made on the *pledge* of said mortgages;" that in pursuance of this resolution the president (Jacob L. Bean) prepared a bond of the form used in connection with the note and mortgage in suit; that Mr. Bean had previously been an agent of the company in getting notes and mortgages of farmers, and witness had been present and heard the statements he made to them ; that he (Bean) had said at those meetings, that if the farmers gave their notes and mortgages, in no case

would they be sold like ordinary securities for the purpose of raising money, but they were to be pledged as collateral security to the bonds which the company proposed to issue and sell; that all the notes and mortgages taken by the company, and all the bonds connected therewith, were of the same character as those used in the present case; that upon Mr. Bean's showing him the bond, witness looked over it very carefully and said, "By this mode of transfer you do not intend to *endorse* the notes accompanying the mortgages;" that Mr. Bean replied; "By no means; for you know that we have no right to do such a thing. We have promised the farmers who made these notes and mortgages, that they should not be sold in the market as commercial paper, for the purpose of raising money, and that we should use them only as collateral security to the bonds of the company; that he (Bean) then went on to say, "By this mode of transfer we accomplish two very important purposes; one of which is, to keep our faith with the farmers, and keep them from prosecution on the notes, which, if endorsed, they would be liable to anywhere in the state or out of it; and the other is, that we protect the company against liability as an indorser. We at the same time transfer to the holder all the rights which the company has in the notes and mortgages, in case it fails to pay the bonds." *Question* : " From your position as a director, and a member of the executive committee, and as president of the company, do you know, of your own knowledge, whether that mode of transfer was got up for any particular purpose, and if any, for what purpose?" *Answer:* "I do; it was got up for the purpose of transferring to the holder all the rights and interests of the company in the notes and mortgages, without converting them into commercial paper and putting them into the market for sale; and also for the purpose of keeping our promises to the farmers that they should not be sold as commercial paper, but only be pledged as security for the bonds of the company." The witness was then asked whether he had had conversations

with persons proposing to buy the bonds of the company with farm mortgages annexed, in which, as an officer of the company, he stated to such persons what was the intention of the company in respect to indorsing the notes accompanying the mortgages, or giving them the character of commercial paper; and whether any applications were made to him, as president of the company, by the holders of farm mortgages, notes and bonds of the company, to have said notes indorsed in fact by the company; and whether, while he was a director, the company refused or consented to indorse in the usual manner the notes disposed of in connection with the bonds; but all these questions were ruled out.

The jury, by direction of the court, found the affirmative of the first issue. On the second issue they found that the note and mortgage were delivered to Burchard on the conditions therein mentioned, and that said conditions were not complied with by the company. Upon the third issue they found that the note and mortgage were taken from Burchard's possession by fraud. On the fourth issue, there being no testimony, they made no finding. The court accepted the finding of the jury, and afterwards filed a further finding of facts, and its conclusions of law thereupon; finding as facts, *inter alia*, that Burchard, at the time of receiving said note and mortgage, was "the agent of the railroad company to solicit and receive the same;" that in the fall of 1855, the railroad company were in possession of said note and mortgage, and then sold and assigned them for value to one Green, who, in October or November of the same year, transferred them (with the company's bond thereto attached) to the plaintiff, for value and in the usual course of business, and that neither Green nor the plaintiff, at the time of their several purchases of said instruments, or at the time of paying therefor, had any notice of any defect in the title of the company to them, or of any defense thereto; that said *McCollum*, in the fall of 1855 or spring of 1856, knew that the plaintiff was possessed of and claimed to own said instru-

ments, and never, until after the spring of 1858, made any objection to his possession of them, or demanded them of him, or took any steps to regain possession of them, and never, until about the commencement of this action, informed the plaintiff that they were taken from Burchard as found by the jury; that he received from the railroad company, in the spring of 1858, a certificate for sixty shares of the mortgage stock of the La Crosse & Milwaukee Railroad Company; that at the time of receiving it he stated to the officers of the company that it was not the kind of stock which the company had agreed to give him in exchange for his said note and mortgage; but that he did in fact receive said stock, and did not then make any objection to the delivery of his mortgage to the company or to its sale thereof. The court further found "that there has been no part of the principal sum secured by said note and mortgage paid, and that the interest thereon has been paid by said company up to the 1st of January, 1858, which is the only payment that has ever been made thereon." Upon these facts the court held that the plaintiff was entitled to the amount due upon the note according to its terms, and to a foreclosure &c. ; and rendered judgment accordingly; from which the defendant appealed.

*Levi Hubbell*, with whom were *Brown & Pratt* and *S. Park Coon*, of counsel, for appellants. [A large part of the full and elaborate argument for the appellants consisted of a discussion of the questions, whether, where a mortgage is executed as security for a negotiable note, the innocent purchaser of the note, for value, before maturity, can enforce the mortgage without regard to equities between the original parties (*Fisher v. Otis*, 3 Chand., 83 ; *Martineau v. McCollum*, 4 id., 153 ; *Croft v. Bunster*, 9 Wis., 503); and whether the mode in which the note was transferred in this case was such an indorsement as to pass the legal title to it, within the law merchant, as held in *Crosby v. Roub*, 16 Wis., 616. The argument on these points is omitted.]

*Mr. Hubbell*, on the question whether oral evidence to show *the purpose* for which the mode of transfer used in this case was adopted by the company, should have been admitted, argued substantially as follows : To indorse the paper was easy ; it was the uniform, universally recognized mode of transferring notes payable to order. But the company resorted to a new and singular, not to say unnatural, process of indorsement. It did not *back* the paper at all ; nor write on its face ; nor even on an " allonge." It made its sealed bond, and included in or added to the bond a special form of assignment of the note and mortgage jointly, and prohibited their enforcement unless the bond, note and mortgage should be fastened and held all together. An instrument which is so singular, uncertain and equivocal needs the light of extraneous evidence—the aid of collateral facts and surrounding circumstances, to enable the court to judge properly of its import and purpose. Such light was thrown on it by the evidence. " The contract of indorsement of a bill or note is not merely a transfer of the paper, but a new and substantial contract." *Slacum v. Pomeroy*, 6 Cranch, 222. This new contract effects two objects : one is, to create a liability on the part of the indorser ; the other is, to give or continue the negotiable character of the paper. The testimony of Dr. Judd discloses facts and circumstances showing conclusively that the company undertook, by the mode of transfer adopted, to avoid the effects of an ordinary contract of indorsement. This testimony makes the whole transaction lucid and intelligible. And it is admissible not only on account of the ambiguity arising out of the *mode and form of transfer* adopted by the company, but from the uncertainty and ambiguity *of the language employed.* " Assign and transfer" are not words of indorsement—at least not the ordinary language employed " according to the custom of merchants." They have a general meaning, and they *may* have also a limited and technical meaning. If so, it is a case where words have " two meanings—the one common and universal, and the other technical, peculiar or

local;" and "parol evidence is admissible of facts tending to show that the words were used in the latter sense." Greenl. Ev., § 295; *Lady Hewley's Charities*, 7 Simons, 290–308 (10 Eng. Ch. R., 71). See also 1 Greenl. Ev., p. 409; *Ely v. Adams*, 19 Johns., 316; *Cole v. Wendel*, 8 id., 116; *Brown v. Brown*, 8 Met., 576–7; *Gray v. Harper*, 1 Story's R., 574; *Fish v. Hubbard*, 21 Wend., 651; *Mechanics' Bank v. Bank of Columbia*, 5 Wheat., 326; *Boorman v. Johnston*, 12 Wend., 573; *Birch v. Depeyster*, 4 Campb., 385; *Simpson v. Henderson*, 1 Mood. & Malk., 300; 2 Cow. & H.'s notes, p. 1358 –1399; *Peisch v. Dickson*, 1 Mason, 11; 1 Phil. on Ev., 562; 2 id., 540. The same counsel further argued that the fact that *McCollum* was informed that plaintiff possessed his note and mortgage, and made no objection, did not bind him to pay void paper. There was no estoppel, because the plaintiff was not induced to purchase by his silence. As to the fact that in the spring of 1858, *McCollum* received a certificate of stock, was this an adoption and ratification of the prior fraudulent and felonious transaction? If the plaintiff relies upon a new promise, he should have alleged it in his complaint. Here, from the manner in which the company became possessed of the note, there was no liability incurred in the first instance by the defendant. Hence, to bind him, the plaintiff must show that the act done was equivalent to a new promise, made voluntarily, upon a new consideration, and with full knowledge of all the facts. This is not pretended. Again, this was not a promise made or act done to the plaintiff, or upon any consideration from him. It was *res inter alios acta*. Before the plaintiff can lay claim to any advantage from it, he must show that the scrip was taken by the defendant with full *intent* to ratify the fraudulent acts of the company, and to give effect and validity to his note and mortgage, when he knew what all those acts were, and knew that he was not liable on the note and mortgage.

Messrs. *Brown & Pratt*, on the same side, made the following among other points: 1. Conceding all that this court has

ever intimated as to the bond being an indorsement of the note, it is still only a *conditional* indorsement. The contract must be interpreted, if possible, so as to give effect and meaning to each part. The following clause in the bond either limits and defines the power of the indorsee over the note and mortgage, or it must be entirely rejected : "The company do hereby authorize and empower the holder of this bond, at any time, *in case said company shall fail* to perform any of the foregoing stipulations, by neglecting to pay," &c., " to proceed and foreclose the said mortgage, or take such other legal remedy on said note and mortgage," &c. The indorsee thus held the mortgage literally as a *dead pledge* until default was made by the company in the payment of their bond, and then for the first time could he demand interest upon the note and mortgage. And the holder so understood it ; for from 1855 until 1859 he never demanded interest of the defendant; nor does he in this suit claim any interest on the note and mortgage from their date until 1859. By the very terms of his indorsement, then, (giving the bond that name,) he could not sue upon nor did he acquire any interest in the note and mortgage, until *default made by the company in the payment of the bond.* This default is therefore a material fact for the plaintiff to allege and prove ; but he has neither allged nor proven it, nor is it found by the court or jury. Again the provision in the bond that before such default by the company, suit to foreclose the mortgage might be commenced, could have been inserted only upon the understanding that the mortgagor would pay no interest, so that there would be a technical default against him at all times. The plaintiff, then, from the face of the bond, knew that the company were the principal debtors, that the defendant was not to pay according to the face of the note, and that in fact the company did not regard him as a debtor, but as *surety* for hem. Plaintiff's failure to demand interest of the defendant on the note, during the years which the company continued to pay the interest on their bond, and his failure to claim inter-

est for those years in his complaint, prove the same fact. The court below violated law and testimony in finding that the company had paid interest for the defendant; whatever they paid was on their own bond, and to take up their own coupons. —Counsel further contended that the court below erred in not submitting all the issues of fact to the jury. Laws of 1864, chap. 169.

*E. Mariner*, for respondent, contended, among other things, that if the railroad company had not transferred the note and mortgage and were the plaintiff in this action, it would be entitled to recover. Burchard was an agent of the company to take this delivery. Delivery to him was therefore delivery to the company. *Worrall v. Munn*, 1 Seld., 238. Delivery of a deed to a party upon parol conditions, is an absolute delivery. *Braman v. Bingham*, 26 N. Y., 492; *Ward v. Lewis*, 4 Pick., 520; *Hinchliff v. Hinman*, 18 Wis., 130. So also of a promissory note. *Gould v. Segee*, 5 Duer, 260. As to defendant's waiver of the performance of the conditions by the company, by receiving the stock, counsel cited *Smith v. Lynes*, 1 Seld., 43; *Pitts v. Owen*, 9 Wis., 152; *Weed v. Page*, 7 id., 503. Defendant waived his right to allege a fraudulent procurement of the note and mortgage against the plaintiff, by his delay to allege it. *Weed v. Page, supra; Masson v. Bovet*, 1 Denio, 74; *Walworth Bank v. Trust Co.*, 16 Wis., 629; 27 Conn., 610; 2 Parsons on Con., 279.

COLE, J. The defense relied on to defeat a recovery on the note and mortgage upon which the action is brought, is, that these securities were placed in the hands of Mr. Burchard on a special trust and confidence, to be delivered to the railroad company if certain parol conditions were fulfilled; otherwise to be returned to the makers; and that the railroad company got possession of these securities without performing the conditions, and without the assent of the makers or of the party who held them. It appears, however, that Mr. Burchard was

acting solely as the agent of the railroad company in procuring subscriptions to its capital stock, and was fully authorized to receive a delivery of the note and mortgage for the company; and it is insisted, with much force of reason, that such being his relation to the parties, these securities could not be delivered to him as an escrow, but that the delivery to him was in law a delivery to the grantee, and that the grantee, or railroad company, took the securities discharged of all conditions.    There are certainly authorities which seem to support this position (*Worrall v. Munn*, 5 N. Y., 229; *Braman v. Bingham*, 26 id., 483); but from the view we have taken of the case it becomes unnecessary to inquire whether they lay down the correct rule of law upon this subject, or whether the facts attending the delivery of the note and mortgage to Mr. Burchard render these decisions applicable to the case at bar.    For the circuit court found as matters of fact (and we think this finding is fully sustained by the evidence), that the defendant *James F. McCollum*, in the fall of 1854 or spring of 1856, was informed and knew that the plaintiff was possessed of and claimed to own said note and mortgage; and that the defendant never, until after the spring of 1858, made any objections to the plaintiff's said possession thereof; nor did he ever before that time demand the same of the plaintiff, nor take any steps to regain the possession thereof; and never until about the time of the commencement of the action, informed the plaintiff that the note and mortgage were delivered to Mr. Burchard upon certain conditions, and that they were fraudulently taken from Mr. Burchard's possession without these conditions being complied with; and *that the defendant, in the spring of* 1858, *received from the railroad company a certificate for sixty shares of stock of the company, without making objection to the delivery of his note and mortgage to the company, or to its sale thereof.*

Now it seems to us very obvious upon these facts, that the appellant, with full knowledge of the circumstances, by receiving the stock of the company, fully ratified the delivery made

by Mr. Burchard, discharged of the conditions upon which the delivery was to be made. The appellant himself was sworn as a witness, and states what these conditions were. He says, after he signed the note and mortgage, he handed them to Mr. Burchard; that the note and mortgage were not to be used and were not to become the property of the company but upon certain conditions; the company wanted to raise one hundred thousand dollars west of Rock River, so that they could complete the road through to Beaver Dam by the 1st of January, and if they did not raise the one hundred thousand dollars, his mortgage was not to be used by the company. Another condition was, that before the company should have possession of the mortgage or should use it, it should deliver him sixty shares of as good stock as it gave to cash subscribers; such stock, he then understood, was then selling at 80 or 90 cents on the dollar in New York; and the mortgage was not to be used until the road was finished to Beaver Dam; the mortgage was put into the hands of Burchard in June, 1855; and the road was not completed to Beaver Dam until the spring of 1856. The witness subsequently testified that in the first conversation he had with Bogert about his mortgage, Bogert said he owned one half of it; afterward Bogert said he had sold to the plaintiff; that this was sometime after the mortgage was given, and the witness thought it was the same year. In the spring of 1858, he confessedly received a certificate for sixty shares of stock of the company, which was the sole consideration for the note and mortgage. It is objected that by his contract with the company he was entitled to the same kind of stock issued to cash subscribers, and that he did not get it. He however did not insist upon having this kind of stock, but received a different kind, which he held and owned at the time of the trial. Under these circumstances it seems to us it would be a violation of well settled principles of law to permit the appellant to say that there never had been any good delivery of the note and mortgage—that they were not binding upon him

because the conditions were not performed upon which they were to be delivered. Suppose the appellant, after the company had obtained possession of the note and mortgage, had gone to the officers of the company and said that he waived all conditions and assented to the delivery made, and then accepted the stock which was the consideration of these securities; could it be seriously contended that the instruments never took effect? It seems to us not; and yet in contemplation of law this is precisely what the appellant has done. So that we have no hesitation in saying that, upon the facts disclosed in the record, the railroad company itself would be entitled to recover in the action, if it were plaintiff and had not transferred the note and mortgage. And it is evident that this view of the case relieves us from the necessity of considering the question so elaborately discussed on the argument, whether, by the transfer of the note and mortgage in the manner it was made, the plaintiff became a holder for value, and can insist upon all the rules of law established for the protection of commercial paper transferred to an innocent holder before maturity. For if the note and mortgage would not be subject to any equities in the hands of the railroad company, it is not claimed that any exist between the parties to the suit. And there certainly can be no valid ground for saying that the plaintiff did not furnish ample proof of his own title.

It is further claimed and insisted, that the case shows that the note and mortgage were transferred merely to secure the payment of principal and interest upon the railroad bond thereto annexed; that therefore the plaintiff only had a right to bring suit upon them when the company should make default; and that such default should be alleged in the complaint. It is true, the complaint alleges an unconditional assignment of the note and mortgage to the plaintiff; that he is now the true and lawful owner and holder of the same; and that there is now due him upon the note and mortgage the sum of $1440. This, by the strongest implica-

tion, is alleging that the company was in default in the payment of the interest due upon its bond; and the bond itself showed that the interest coupons had not been paid since January 1st, 1858. But perhaps a more satisfactory answer is, that the objection is a technical one, even if valid, and was not taken in the court below, where it could have been obviated by an amendment of the complaint. We think it too late now to object that the complaint should specifically aver that the company had made default in the payment of its bond. And although the principal and interest on the railroad bond were made payable at the Broadway Bank in the city of New York, yet the weight of authority in this country is, that it was not incumbent upon the plaintiff to aver and prove a demand of payment at that place. *Wallace v. McConnell,* 13 Peters, 136.

It appears that certain issues in this case were submitted to a jury, and it is insisted that under chap. 169, Laws of 1864, every fact put in issue should have been passed upon by the jury. In our view the issues submitted to the jury were not material. They were however the only issues of fact that the defendant requested should be tried by the jury. If the issues were not as broad as they should have been, it was the defendant's fault. He certainly cannot now object that other facts should have been submitted. The law of 1864 does not even profess to make it imperative upon the court to submit every issue of fact joined in an action to foreclose a mortgage to a jury. But every such issue *"upon demand of either plaintiff or defendant,* shall be tried by a jury, and the finding of the jury as to such issue of fact shall be final and conclusive, as in other cases of trial by jury." Whether, under the constitution of this state, it is competent for the legislature to make the finding of a jury upon questions of fact in an equity cause conclusive and final, and not merely advisory, is a point not necessary to be considered now. The jury did not pass upon the question whether the defendant had not by his acts ratified the delivery of the note and mortgage dis-

charged from all conditions, because no such issue was submitted to them.

To avoid all misapprehension, my brethren think I had better add, that we do not suppose it incumbent upon the circuit court to submit in an equity cause the trial of issues of facts to a jury, unless it thinks proper to do so.

We think these remarks dispose of the material questions in this case.

*By the Court.*—The judgment of the circuit court is affirmed.