CALLANAN VS. JUDD and others.

*Constitutional law — Questions of fact in equity to be determined by the Court.—*
*Parol evidence to contradict legal effect of instrument. — Question of fraud.*

1. When our state constitution was adopted, the determination of questions of fact in equity cases was an exercise of the *judicial* power.
2. Chapter 79, Laws of 1867, which prohibits courts from trying any action to foreclose a mortgage in which there are issues of fact, without the intervention of a jury, except upon the written stipulation of the parties, and gives to the verdict the same force and effect as in actions at common law, is invalid, being in conflict with section 2, article 7 of the state constitution, which vests in the *courts* the judicial power of the state both as to matters of law and equity.
3. In an action on a note and mortgage of land made to a railroad company, and transferred to plaintiff with the company's bond in a form which (under the decisions of this court) constituted an indorsement of the note within the law merchant, parol evidence that the company, in making the transfer, intended it to have a different effect, is inadmissible.
4. Even as against the company, its refusal to execute an oral agreement made at the time the note and mortgage were given, that it would construct the road on a particular route, would not be such a fraud as would let in parol evidence to contradict the written contract.

APPEAL from the Circuit Court for *Dodge* County.

Action upon a mortgage executed by the defendant *Judd*, in June, 1855, to the La Crosse and Milwaukee Railroad Company, as security for his note of the same date. The note and mortgage were attached to the bond of the company, and, by the terms of said bond, were assigned to the holder thereof as security for its payment; and plaintiff claimed as owner of the bond. The defense was, that the railroad company, before the execution of said note and mortgage, had fraudulently pretended to locate its road through the village of Fox Lake, in said county, and to select lands in that village for a depot, and had fraudulently promised to build its road on that line and establish a depot in said village, and that it would retain said

note and mortgage, and not dispose of them until the road and depot should be so constructed, and in case they were not so constructed within a reasonable period, would return said instruments to the defendant; and that said note and mortgage were executed in reliance upon these representations and promises, but they had never been fulfilled, the road and depot having been located in a different place. It is further alleged, that defendant was the owner of considerable real property in and near the village of Fox Lake, which would have been greatly increased in value by the location of the road and depot as promised; that this was the main inducement to the execution of said note and mortgage, and that the foregoing facts were known to the plaintiff before he obtained possession of those instruments. It is also alleged, that the railroad company never indorsed, or undertook or intended to indorse, said note, or to transfer the same according to the custom of merchants, " but, on the contrary, devised and adopted a mode of assigning and transferring the same in such form as to pass the title thereto, but not to make said company liable as the indorser thereof, and not to give the holder thereof the rights and privileges of a holder of commercial paper; " and that the plaintiff, before he became holder of the note and mortgage, was fully advised of said purposes and acts of the company.

The court, against the plaintiff's objection, directed a jury to be impaneled pursuant to chapter 79, Laws of 1867, for the trial of the cause. After the evidence for the plaintiff was in, defendants called *Mr. Judd* as a witness, who, against plaintiff's objection, testified as to the manner in which the bonds of the railroad company were prepared; the resolution of the board of directors authorizing its preparation; a conversation between the witness and the president of the company in regard to the intent and legal effect of the bond; and the personal knowledge of the witness, as a director of the company, as to the intentions of the board of directors. This evidence

was the same that is stated at length in the case of *Truman v. McCollum et al.*, 20 Wis. 362–64.

In addition to what is there stated however, the witness testified in this case, that plaintiff came to him as president of said railroad company in 1855, saying that he had money to invest and wished to inquire about the company's securities; that witness exhibited to him a large number of farm mortgages, with bonds attached, ready to be disposed of, including the note and mortgage in suit; plaintiff remarked that the note was payable to the company's order, but was not indorsed by it; witness replied that it was not intended to be indorsed — that the company had expressly refused to indorse any of that kind of paper; witness also called his attention to that clause in the bond which provided for an assignment of the note and mortgage, and explained to him fully how and why, and by whom, the form of the bond was gotten up. "He asked me how I knew, or what assurances I had, that the company would construct the road through Fox Lake. I said that we had all of us, at Fox Lake, understood that the road was to be constructed through Fox Lake; that we had that understanding with the officers and agents of the company. He said: 'And you, residing at Fox Lake, only make a mortgage of $500, while your neighbors make theirs much larger.' I then told him that I had taken $2,500 on my home farm; that I had $5,000 cash stock, besides, which was all that I originally intended to take; that in consequence of the resolution of the company, locating their road through Fox Lake, and establishing their depot grounds there, and the necessity for more means to carry on the work, I had made this mortgage of $500, and had taken $1,000 cash stock, and but for the location of the road through Fox Lake, and establishing the depot grounds there, I should not have given the $500 mortgage and taken the $1,000 cash stock; that the officers and agents of the company knew that was why I made the additional mortgage and cash stock. He said,

'Suppose the directors should alter their line of road and refuse to construct it through Fox Lake, what would you do then?' I said, ' I do not believe they will do any such thing, but if they should, I should certainly refuse to pay my mortgage, for I would not have them fail to construct the road through there for any amount of money.'" Witness further testified that said note and mortgage were delivered to the "stock agent" of the company, on the condition, and the promise of said agent, that the road should be constructed through Fox Lake, and the depot located therein; that it was only upon this consideration that he gave the mortgage, and the board of directors were so informed. All this evidence was received against plaintiff's objection.

The court instructed the jury, *inter alia*, that if they believed the testimony of *Judd*, they would find that the note offered in evidence was not intended to be indorsed by the railroad company, or assigned and transferred in such a manner as to render it negotiable under the laws of this state, and was not so indorsed by the company, and that plaintiff had notice of these facts before he bought the note and mortgage; that if plaintiff, before such purchase, was notified that the instruments were delivered to and received by the company upon any fraudulent promise or condition, and if such promise or condition was not fulfilled by the fraudulent act of the company, and if it was the consideration upon which the instruments were made, then plaintiff could not recover in this action.

Verdict for the defendant; new trial denied; and judgment upon the verdict; from which the plaintiff appealed.

*Francis Bloodgood*, for appellant, contended that the judicial power of the state is vested by the constitution in the courts. Const., art. 7, § 2; *Attorney-General v. McDonald*, 3 Wis. 805; *Attorney-General v. Blossom*, 1 id. 321. The two distinctive departments of judicial power, law and equity, are clearly recognized and perpetuated by the constitution. The

distinction between law and equity has been clearly recognized by this court; and the jurisdiction of courts in equity cases includes the right to decide questions of fact. *Johnson v. Johnson*, 4 Wis. 135; *Gill v. Rice*, 13 id. 553; *Stillwell v. Kellogg*, 14 id. 361; *Truman v. McCollum*, 20 id. 360; 1 Story's Eq. § 31.

2. No evidence of any pretended collateral parol contract between the railroad company and the defendant was admissible. *Erwin v. Saunders*, 1 Cow. 249, and cases there cited; 1 Greenl. Ev. §§ 275, 276. The note being negotiable under the law merchant, and having been in effect indorsed by the company (*Crosby v. Roub*, 16 Wis. 625), the defense claimed, even if good against the company, is without avail against the plaintiff. The breach of an executory contract of the company, which formed the consideration for the note and mortgage, would be no defense in this action. *Davis v. McCready*, 17 N. Y. 230; *Cameron v. Chappell*, 24 Wend. 95, and cases cited by NELSON, J.; *Dowe v. Schutt*, 2 Denio, 621.

*Levi Hubbell*, for the respondents, contended that chapter 79, Laws of 1867, is valid under section 8, article 7 of the constitution of this state, which provides that the circuit courts shall have original jurisdiction in all matters, civil and criminal, within this state, not excepted in this constitution *and not hereafter prohibited by law.*" The power to prohibit is a power to regulate, control, destroy. All the jurisdiction conferred by the constitution upon the circuit courts is therefore subject to be limited, regulated or abrogated by the legislature. By the Code of 1857, "the distinction between actions at law and suits in equity" was abolished; and although a trial by the court was required in some cases, and a trial by jury in others, yet in the exercise of this discrimination complete power over the whole subject-matter was asserted by the legislature. R. S., ch. 132, § 6. Counsel further contended that the company had not intended to bind, and had not bound, itself as an indorser of

the note; that consequently the note was not protected by the law merchant in the plaintiff's hands; and that a defense against the note in the hands of the company had been shown.

PAINE, J.   This being an action to foreclose a mortgage, and having been tried with a jury, the respondent's counsel claims for their verdict the conclusive effect given by chapter 79, Laws of 1867.   That act prohibits courts from trying an action to foreclose a mortgage in which there are issues of fact, without the intervention of a jury, except upon the written stipulation of the parties; and gives to the verdict the same force and effect as in actions at common law.   It professes to divest the courts of all jurisdiction to try any action for foreclosure, except as therein provided.   If the act is valid, of course the verdict is to have the same effect as in an action at law, otherwise not.

I think the act invalid, and my reasons are briefly as follows: The power to decide questions of fact, in equity cases, belonged to the chancellor, just as much as the power to decide questions of law.   It was an inherent part, and one of the constituent elements, of equitable jurisdiction.   If, therefore, it shall appear that, by the constitution, the equitable jurisdiction existing in this state is vested in the courts, I think it will necessarily follow, that it would not be competent for the legislature to divest them of any part of it, and confer it upon juries.   If they can do so as to a part, I do not see why they may not as to the whole.   If they can say that in an equity case no court shall render any judgment except upon the verdict of a jury on questions of fact, I can see no reason why they may not say that the jury shall also be allowed to decide the questions of law.

But the constitution, in section 2, article 7, provides that " the judicial power of this state, both as to matters of law and equity, shall be vested in a supreme court, circuit courts, courts of probate and justices of the peace.   The legislature may

also vest such jurisdiction as shall be deemed necessary, in municipal courts, and shall have power to establish inferior courts in the several counties, with limited civil and criminal jurisdiction."

In order to determine the meaning of the phrase "judicial power as to matters of law and equity," it is only necessary to recur to the system of jurisprudence established in this country and derived from England, in which the courts had certain well-defined powers in those two classes of actions. In actions at law they had the power of determining questions of law, and were required to submit questions of fact to a jury. When the constitution, therefore, vested in certain courts judicial power in matters at law, this would be construed as vesting such power as the courts, under the English and American system of jurisprudence, had always exercised in that class of actions. It would not import that they were to decide questions of fact, because such was not the judicial power in such actions. And the constitution does not attempt to define judicial power in these matters, but speaks of it as a thing existing and understood. But, to remove all doubt, in actions at law the right of a trial by jury is expressly preserved by another provision.

But, as already stated, the power of a court of chancery to determine questions of fact, as well as of law, was equally well established and understood. And when the constitution vested in certain courts judicial power as to matters in equity, it clothed them with this power, as one of the established elements of judicial power in equity, so that the legislature cannot withdraw it and confer it upon juries.

I do not think the provision of section 8, article 7, relied on by the respondent's counsel, has any bearing on the question. That is as follows: "The circuit court shall have original jurisdiction in all matters, civil and criminal, within this state, not excepted in this constitution, *and not hereafter prohibited*

*by law*, and appellate jurisdiction from all inferior courts and tribunals and a supervisory control over the same."

It is claimed that this contains a clear implication that the legislature may prohibit to the circuit courts such original jurisdiction as it sees fit.  But it is obvious that there is no design hidden under this implication to authorize the legislature to disturb the constituent elements of the judicial power, as between the court and the jury; and, while leaving the court jurisdiction of the case, to withdraw its judicial power from it and vest it in the jury.  This would be readily conceded, if, under the pretended authority of this section, the legislature should enact that all questions of law should be decided by the jury.  But such an act would clearly be valid, if it was the design of this section to give the legislature an unrestricted discretion over this whole matter, as is claimed.

The plain object of this provision was to enable the legislature to distribute the jurisdiction in both matters at law and in equity, as between the circuit courts and the other courts in the state, giving to the circuit courts such original jurisdiction and such appellate jurisdiction as it might see fit.  But the jurisdiction there intended was jurisdiction of the suit.

It may well be that the legislature may deprive the circuit courts of original jurisdiction in actions for the foreclosure of mortgages.  It is unnecessary to determine whether it could or not.  But it is quite certain that this clause contains no authority for it, while leaving those courts jurisdiction of this class of actions, to attempt to withdraw from them an acknowledged part of the judicial power and vest it in the jury.

Under the old equity system, the chancellor might at any time refer questions of fact to a jury, but it was merely to inform his conscience.  He might, if he saw fit, disregard their verdict, and take it upon himself to dispose of the questions of fact absolutely, as he could have done in the first instance. And I think the verdict here is entitled to no greater force and

Callanan vs. Judd and others.

effect than it would have had in an equity case independently of this act of 1867.

The whole question was determined by this court in the case of *Freeman v. McCollum and others*, 20 Wis. 360, where, notwithstanding an express provision in the act of 1864, requiring the courts to submit issues of fact in these cases to a jury, the court decided that the circuit court was not bound to submit such issues to a jury unless it saw fit.

The parol evidence in regard to the intention of the company in adopting the form it did, of transferring these securities, was inadmissible. This court has decided in *Crosby v. Roub*, 16 Wis. 616, that such a form of transfer is a sufficient indorsement to pass the legal title within the law merchant, and consequently to cut off the equities between the original parties. So long as that decision is adhered to, it will be incompetent to prove by parol that the company, in making such a transfer, intended it to have a different effect. It might just as well be proved by parol that in making an ordinary indorsement the party intended it to have a different effect from that which the law attaches to it.

It may, however, be worthy of remark, that the evidence offered on this point shows a somewhat singular confusion of intentions on the part of the company. It did not intend to sell the notes and mortgages "in the market as commercial paper for the purpose of raising money," but it did intend to transfer them as collateral to its own negotiable bonds for the purpose of raising money in the market. It intended to keep the farmers from liability to prosecution on the notes, but at the same time it intended "to transfer to the holder all the rights which the company had in the notes and mortgages, in case the company failed to pay its bonds." A singular device to accomplish the purpose of transferring, and at the same time not transferring securities in the money market. The whole pretense that there was any design to divest these trans-

fers of any of the ordinary incidents of the transfer of nego-
tiable paper, seems utterly improbable.   Instead of weakening
the character of their securities, as such a form of transfer
must inevitably have done, they desired to strengthen them.
For this purpose, they attached the notes and mortgages to
their own bond, that the purchaser might have a double
security, and that they might go into the money markets of
the world and negotiate them on the most favorable terms.
They were procured for the express purpose of being nego-
tiated to raise money.   And so careful were they not to impair
the value of the securities for sale, that when they agreed to
save the mortgagor harmless from the interest, in consideration
of an assignment of the dividends upon the stock, they
expressly provided that this agreement should be no defense
on the part of the mortgagors against the payment of such
interest, if the notes and mortgages should be in the hands of
third parties as securities or otherwise.   Such was the agree-
ment in this case, as appears by the defendant's own testimony.
And yet, in the face of all these glaring considerations to the
contrary, it is attempted to show, by parol evidence of the
opinions of some of the officers of the company, that this form
of transfer was devised for the purpose of burdening these
securities with all the equities between the original parties,
into whosesoever hands they might go.   If parol evidence were
admissible at all, I should desire to hear the understanding of
both parties to the transfer.   And it would take something
stronger than the confused and conflicting intentions disclosed
by the evidence in this case to convince me that even the
company had any such design.

The parol evidence that it was a part of the agreement upon
which the mortgage was delivered, that the road should be
constructed on the route which had then been selected, was
also inadmissible.   It was not competent to thus attach condi-
tions to written instruments. *Harvey v. Lafflin*, 2 Carter (Ind.)

477; *Railsback v. Turnpike Co.*, id. 656; *Jones et al. v. Turnpike Co.*, 7 Ind. 547; *Wight v. Shelby R. R. Co.*, 16 B. Mon. 4; *Martin v. R. R. Co.*, 8 Florida, 370; *R. R. Co. v. Bailey*, 24 Vt. 465.

These cases show that parol evidence may be given to show fraud. But there is nothing in the evidence here offered tending to show any fraud whatever in the procurement of the mortgage and note of the defendant. Clinton, the agent of the company, who procured the note and mortgage, promised, as the testimony states, that the road would be constructed on the route which had already been selected. Subsequently the defendant states the conversation as follows: "He said, 'You know it was established, and it never will be changed, and if you give your mortgage it will be built;' and I said, 'Very well; if it is a promise on the part of the company, I shall give my mortgage.' He said it would be done, there was no question about the faith of the company."

This, on its face, is nothing more than a strong expression of opinion on the part of Clinton that the company would build the road on that route. There is nothing to show that he did not make the statement in the utmost good faith. There is nothing to show any fraudulent design on the part of the company in establishing or changing its route. The only fraud claimed is its not complying with this alleged parol agreement to build the road upon that route. This is not such a fraud as will let in parol evidence to contradict a written contract. If it was, then such evidence could be admitted in every such case. It is similar in principle to the question decided in *Rasdall's Adm'r v. Rasdall*, 9 Wis. 379, where it was held that the mere refusal to execute a parol agreement to hold land in trust was not such a fraud as would let in parol evidence to show an absolute deed to have been given in trust.

I think, therefore, the evidence fails to show any legal defense to this action, if it had been brought by the company. And

the motion of the plaintiff for judgment ought to have been granted.

*By the Court.* — The judgment is reversed, and the cause remanded with directions to enter judgment for the plaintiff in accordance with the prayer of the complaint.