## LOUISIANA PURCHASE EXPOSITION COMPANY, Respondent, v. KUENZEL, Appellant.

### St. Louis Court of Appeals, November 1, 1904.

1. **CORPORATIONS: Subscription for Stock: Evidence: Articles of Association.** In an action by the Louisiana Purchase Exposition Company, organized under the act of 1899 (Laws of 1899, page 130), for a balance of an unpaid subscription for stock in that company, against a subscriber, whose subscription had been made on the condition that a certain amount of stock should be subscribed, the recitals in the articles of association of the said company, filed in accordance with the law under which a certificate of incorporation was issued by the Secretary of State, was proper evidence of the amount of stock subscribed. The duty of determining the fact as to the amount of stock subscribed was upon the original incorporators and their finding in the absence of fraud, as set forth in their articles of incorporation, was conclusive.

2. ——: ——: ——: **Opinion.** Where, in such case, the subscription books were so bulky and voluminous as to render their direct examination in court impracticable, it was competent for a witness, who had charge of such books, to testify, giving a general summary of their contents, there being no effort on the part of the defendant to have the books produced in court and defendant having been given an opportunity to examine the books previous to the trial.

Appeal from St. Louis City Circuit Court.—*Hon. M. N. Sale*, Judge.

AFFIRMED.

*Rassieur & Buder* for appellant.

(1) The testimony of the witness Madden as to the total subscriptions was not competent, in the absence of the books themselves. Greenleaf on Evidence (16 Ed.), sec. 563h; 2 Jones on Evidence, sec. 592; Ritchie v. Kinney, 46 Mo. 298; State v. Findley, 101 Mo. 217, 14 S. W. 185; Rosenfeld v. Siegfried, 91 Mo. App. 169; Benefit Society v. Lackland, 97 Mo. 137, 10 S. W. 895; Wolff v. Matthews, 39 Mo. App. 376. (2) The rule making the corporation's books evidence in its own behalf must be strictly construed. Bain v. Railroad, 3 H. L. C. 22.

*Franklin Ferriss, Clinton Rowell* and *J. H. Zumbalen* for respondent.

(1) The defendant's demurrer to the evidence was properly overruled, as there was competent evidence of the performance of the condition on which his liability depended. (2) The plaintiff's articles of association were evidence that the required amount had been subscribed. R. S. 1899, secs. 1523, 1525; Bank v. Church, 29 Conn. 137; Railway v. Bailey, 24 Vt. 465; Railway v. White, 41 Me. 512; Railroad v. Brooks, 60 Me. 577. (3) The testimony of Mr. Madden as to the total amount of the subscriptions, was competent, without the production of the books and subscription lists. Underhill on Evidence, sec. 37; Fitzgerald v. Beers, 31 Mo. App. 356; Drummond v. Stewart, 8 Ia. 341; Taylor on Evidence (9 Ed.), sec. 462; Greenleaf on Evidence (15 Ed.), sec. 93; Rogers v. State, 99 Ind. 218; Spencer v. Billings, 3 Campb. 310; Roberts v. Doxan, Peake 83; Meyer v. Sefton, 2 Starkie 274; Ben. Soc. v. Lackland, 97 Mo. 139, 10 S. W. 895. (4) Defendant should have called for the production of the books and lists, if he wished to use them. Fitzgerald v. Beers, 31 Mo. App.

356; Drummond v. Stewart, 8 Ia. 341; McCann v. Gould, 71 Conn. 629.

REYBURN, J.—This proceeding was instituted by plaintiff against the defendant, as a delinquent subscriber, for the enforcement of his subscription to its capital stock.   The petition narrated, that with many others, appellant united in subscribing a written agreement to become a stockholder, for an enumerated number of shares in a corporation to be organized to solemnize the one hundredth anniversary of the Louisiana Purchase, upon condition that such subscription should not become obligatory until the full amount of five millions of dollars should have been subscribed, and agreeing to make payment for such subscription in manner detailed; that the total of the requisite and named amount was duly subscribed, the proposed corporation organized, and all steps adopted required by law for the incorporation of such company; that it had accepted such subscription of defendant and, relying upon the subscription of defendant and his associates, it had proceeded to obligate itself for and expend large sums of money in its organization, construction of buildings and other preparations for a World's Fair in the city of St. Louis.   Continuing, the petition charged the making of the various calls upon the subscribers to its stock in manner provided by such subscription instrument and notice thereof to appellant, that he had paid the first installment of ten per cent, but had defaulted in subsequent calls and judgment therefor was asked.

The answer admitted the execution of the subscription, but making denial of all other allegations of the petition, by way of affirmative defense, averred that the amount of five millions of dollars essential to render defendant's subscription binding never was subscribed, but that the aggregate subscriptions fell short of such amount.   A jury was waived, and the trial before the

court terminated upon the close of the evidence offered by the plaintiff, the defendant tendering no proof but profferring a demurrer to the evidence which was overruled, and a finding and judgment were had in favor of plaintiff.

1. The initial contention of appellant is that his agreement to become a subscriber to plaintiff's stock was not absolute and unqualified, but was conditional and dependent, and the burden devolved upon plaintiff to establish by competent legal proof, due compliance with the antecedent conditions before recovery was warranted, and that it had failed to demonstrate such performance by legal evidence.

The first section of the legislative act, general in character but special in its practical application and employment, being an act of the Fortieth General Assembly of the State of Missouri, under which, together with subsequent amendatory acts not material herein, the plaintiff was brought into legal existence, April, 1901, and denominated "World's Fairs and Centennial Expositions" (Laws 1899, 130) and adopted to commemorate and solemnize the centennial anniversary of the Louisiana Purchase by holding a World's Fair at the city of St. Louis, in defining the recitals to be set forth in the articles of agreement for the legal creation of a corporation to be invested with the powers and authority of such legislative act, and for the purposes enumerated in section 6, especially the inauguration and maintaining of national, international and World's Fairs, centennial and other expositions, commemorative of any historical event or for the promotion and encouragement of the arts, sciences, professions and industries by the exhibition of products of the arts, industries and manufactures and of soil, land and sea, prescribed that the amount of the capital stock of the corporation, the number of shares of a minimum par value of ten dollars and maximum of one hundred dollars per share, and that not less than one-half of the entire

amount thereof had been subscribed in good faith and ten per centum of the amount subscribed, actually paid up in lawful money of the United States and was in possession of the directory or had been disbursed for preliminary expenses of organization, should be set forth, and section 3 provided that the stock of such corporation should not fall below $500,000 nor exceed $20,000,-000, reiterating that at least one-half of the capital stock should be subscribed for in good faith and no less than ten per centum paid up at the time of filing the articles, the remaining ninety per cent to be subject to the call of the board of directory, in such sums and at such times as might be agreed upon by the subscribers in the association articles. The instrument of association, introduced at the hearing, responded to the requisites of the act in question by embracing provisions and recitals that the authorized amount of the capital stock should be six millions of dollars, divided into six hundred thousand shares of the par value of ten dollars, five millions dollars of which capital stock had been subscribed in good faith, and that ten per cent of the amount subscribed was either in the custody of the first board of directors or had been appropriated to expenses of organization, and upon the faith of such instrument embodying all other statements and specifications made requisite by the act, after its execution by an appropriate number of subscribers, recording and like formal steps, the certificate of incorporation issued from the office of the Secretary of State and after recording the latter, the legal creation of the plaintiff was perfected.

The evidence received, presently further considered, being the testimony of a witness familiar and entrusted with the subscription lists and original subscriptions, which had been preserved and transferred under his individual direction, by him personally verified and compared, and the aggregate amounts computed, established that the subscription lists, accounts

and books were bulky and voluminous, comprehending over twenty-three thousand individual subscriptions, appearing in exceeding one thousand different lists, making a total subscription of over $5 276,000, from which total at time of hearing $4,686,000 had been realized in cash. Confronted by such facts and from the language of the act under which the plaintiff was organized, the legislative intent may be fairly gathered and the reasonable inference drawn that upon the original incorporators, who in obedience to the statutes signed and acknowledged the agreement of association, were devolved the discretion and duty of determining and adjudging as an existing fact, the true amount of the capital stock subscribed, and that such conclusion by these incorporators was a final determination of this question; and it logically follows, further, that in legal contemplation and intendment the signers of such agreement exercising such authority and power, in their sound judgment were acting as the authorized representatives of the whole mass of stock subscribers upon whom such action and their deduction, in absence of fraud or bad faith, of which this record contains no intimation, were and are determinate and binding. While this proposition may be held up at present for the first instance to the contemplation of an appellate court in Missouri, cases analogous and eliciting the expression of similar principles abound, and have been submitted by industrious counsel.

In Litchfield Bank v. Church, 29 Conn. 137, an action to enforce a subscription to capital stock of a bank organized under a special act of the State of Connecticut, under which a board of commissioners was delegated to superintend subscriptions to the bank and certify the result and where the validity and good faith of specified subscriptions were assailed, the Supreme Court of that State replies:

"In the next place, we think the doings of the commissioners are conclusive on this point. The commis-

sioners under this charter were specially deputed by the Legislature to repair to Litchfield, in order to superintend the subscription to the bank, and decide and certify to the subscribers when the requisite amount of stock has been taken, and by whom, in order that the stockholders might make choice of directors and enter upon the appropriate business of the institution. This they did, and they gave their certificate that the one thousand shares were subscribed, naming the defendant and J. R. Houghton therein as stockholders, each to the amount of one hundred shares, and the corporation commenced business and issued bills to a large amount. If after this the defendant can attack the commissioners' certificate and show it to be untrue, especially for the reason that the one thousand shares were never effectually subscribed, there is no safety for anyone in relying upon the preliminary and initiatory proceedings in such cases, and the form had better be abandoned as deceptive and useless."

In Connecticut & Pass. Rivers R. R. Co. v. Bailey, 24 Vt. 465, a proceeding to recover assessments upon the stock of a railroad corporation, where the defense made impugned subscriptions to the capital as fictitious and not bona fide, and where the plaintiff was organized pursuant to an act empowering commissioners, when the quota had been subscribed, to take steps for the organization and make return to the Secretary of State, the court of that State declares: "To guard against fraudulent subscriptions, and to see that this provision of the act was complied with, commissioners were appointed under the fourth section of the act of 1835, whose duty it was to open books and receive subscriptions, and when the amount required was raised, to notify a meeting of the stockholders for the election of directors, and of which they are the inspectors; and they are required to certify under their hands, the names of those elected, and by the fifth section of the act of 1845, that organization is to be duly certified to

the Secretary of State; and from the certificate of the Secretary, which is made part of the case, it appears that all these requirements of the act have been complied with. As a preliminary question, therefore, before the commissioners could call for an election of directors, and effect that organization, or make their several certificates thereof, they were required to ascertain and find as true, that the full amount was raised by subscription, as required by the act. They were a board appointed by the Legislature for that specific purpose, as well as to direct in all those preliminary steps necessary for a legal and proper organization of the company. As the act required their certificate of that organization to be made and filed in the office of the Secretary of State, that certificate must be considered as conclusive evidence of its organization, as well as of the validity and amount of the subscriptions, so far, at least, as the question of a legal organization of the company is concerned. It could have been for no other object, but to produce that effect, that the act required that certificate to be made and filed. . . . On the production of that certificate, therefore, with the other evidence introduced, of an organization in fact, their existence as a corporation, and their organization under their charter, was proved by the best evidence the nature of the case admits, and the certificate is as conclusive, upon the validity of the subscriptions, and the amount, and on the question of a legal organization, as upon any other preliminary fact, which they were authorized to find and certify.''

It may be deserving of remark that the report of commissioners in the cases above cited is replaced under the law of Missouri, by articles of association, but no just distinction can be observed between the officers and powers of the incorporators and such commissioners.

In Belfast & Moosehead Lake Railway Co. v. Inhabitants of Brooks, 60 Me. 568, an action in assumpsit

to recover balance of amount subscribed by defendant in the plaintiff railroad company's stock, where it was advanced by the defense, that the by-laws of plaintiff provided that no assessment should be made until the full amount of the estimated cost to the road should be subscribed by responsible parties, and that it was incumbent on plaintiff to show affirmatively that this condition had been complied with, the Supreme Court responding said: "The plaintiffs do show affirmatively that the estimated cost of the road was subscribed before the assessments in question were made; and there is no evidence before us that the parties who made the subscriptions were not responsible. In the absence of proof to the contrary, we think it but reasonable to presume that in the judgment of the directors they were responsible (otherwise they would not have made the assessments), and this is all that the law requires. If the directors, acting in good faith, came to the conclusion that the subscriptions were made by responsible parties, and thereupon proceeded to make the assessments required to carry forward the enterprise, the assessment would not be rendered invalid by proof that they erred, and that some of the subscribers were not in fact responsible. Whether or not the requisite amount had been subscribed by responsible parties must necessarily be decided by the board of directors, for there was no other person or persons, or tribunal, by whom the question could be determined at that stage of the proceedings; and if they, acting in good faith, came to the conclusion that the estimated cost of the road had been subscribed by responsible parties, and thereupon proceeded to make the assessments, we think the assessments would be legal and that they could not be rendered invalid by showing, as matter of fact, that some of the subscribers were not responsible. To hold otherwise would be a dangerous doctrine. It would probably destroy nine-

tenths of all the assessments made in similar enterprises, and throw the business of the companies into chaotic and inextricable confusion. We think this objection is not sustained.''

In the earlier case of Penobscot Railroad Company v. White, 41 Me. 512, a similar action for recovery of assessments to a railroad subscription, the same court declared: ''From the very nature of the contract of subscription, it must have been within the contemplation of the parties, that the shareholders, or corporators, should determine who were apparently responsible as subscribers, and when they had done so in good faith, the subscribers to the stock must be regarded as bound by such decision.''

It is manifest that such introductory questions must be referred for decision to some competent and proper body composed of individuals whose judgment and conclusions are at least presumptively correct and fixed, subject only to impeachment for fraud or if absence of good faith be established. It would be difficult to picture an instance where the foundation and application of this rule would appear more in harmony with reason and sound judgment than illustrated by the prodigious undertaking of the plaintiff and its diversified and multitudinous stock subscribers.

2.   It is further urged on behalf of defendant that the trial court erred in admitting the opinion of the witness tendered, who had been in charge of the subscription books and accounts of plaintiff for a period anterior to its organization, and uninterruptedly had remained and then was in their possession, and who was suffered to be interrogated respecting their ponderous bulk, the character, classification, amounts and results of the entire subscriptions, and the error charged is pressed as conspicuous in absence of the books and subscription lists themselves. At this threshold, it may be emphasized that no objection was made to the admissibility of the evidence of this witness on the theory

that the books and lists should have been contemporaneously produced by plaintiff in court, nor had their presence in court been called for by defendant, but the objections made were based on the questions calling for conclusions of the witness and being improper and incompetent. It was developed in the course of the hearing that on behalf of plaintiff, an invitation had been early extended to defendant's counsel to examine the subscription lists and books, and that his counsel had visited plaintiff's office and had seen the books, but in his own words had declined their examination on account of the magnitude of the undertaking and the poor facilities at hand for making the examination.

The reason justifying the exception made to the general rule of evidence requiring the contents of books and papers to be established by the exhibition of the writings themselves, where the evidence aimed at is the general summary of voluminous facts, or the result of calculations ascertained from the examination of numerous books and papers, has been assigned by a leading commentator in the following sentences:

"To prevent the time of the court from being unduly occupied in the examination of evidence consisting of numerous and bulky books and papers in order to prove a single fact or circumstance, the production of such voluminous writings may be dispensed with, and a witness may state verbally the general result of his examination of books or written instruments made out of court. Here it should be noted the witness is not asked to testify to the contents of the writings. He is asked to give primary evidence of an independent fact within his personal knowledge which he has ascertained by the use of his own powers of observation. Thus an expert who has examined the books of account bearing upon the facts in issue may testify that a certain general balance is due thereon," etc. Underhill, Evidence, sec. 37.

Other eminent text-writers may be cited to same

purport, notably, 1 Taylor, Evidence (9 Ed.), sec. 462; 1 Greenleaf, Evidence (16 Ed.), sec. 563h; Chases-Stephens' Dig. Evidence, p. 189, note h.

Such testimony is tolerated, where the books and papers are so considerable and unwieldy, as to render their direct or immediate examination in court impracticable or difficult. It is apparent, therefore, that the physical presence or absence of the documents themselves is not decisive of the admissibility, but that the latter is a distinct and independent question. If the exhibition of such books and papers shall have been required by the opposite party to test or corroborate by cross-examination the statements of the witness testifying, their production becomes imperative or their non-production should be justified by legal apology, but where the production of the books and papers, the results of which are offered orally in convenient and intelligible form, has not been required or called for, as in the present instance, the witness offered to establish their contents, under the conditions here presented, is not to be disqualified by objecting to the non-appearance of the documents, which have not been requested. We have been referred to no authority in this State, determining this proposition, but the same question has been considered by the appellate tribunals of sister States.

In McCann v. Gould, 71 Conn. 629, the court says: "In such cases, unless there is some legal excuse for not producing the books of account from which the witness has obtained the result testified to, they must be produced, if required by the opposing party, for examination, or to enable him to cross-examine the witness."

In Iowa, the court, in reply to the objection that the testimony of a witness could not be received in absence of the book itself, declares: "The testimony was unquestionably competent, and it was so, either with, or without the books. There was no necessity for the

plaintiff to produce the books in the first instance; and if the defendant wanted them, he should take proper steps to cause them to be brought in. Had he been refused, on such an application, it might be ground for complaint, but this testimony was admissible without the books.'' Drummond v. Stewart, 8 Ia. 341. The same conclusion is expressed by the Supreme Court of Indiana. Rogers v. State, 99 Ind. 218.

No error is revealed in the trial of this cause and the judgment of the lower court is affirmed. All concur; *Goode, J.,* in result.